**STORED VALUE SOLUTIONS, INC.,**
**("n/k/a") Ceridian Stored Value**
**Solutions, Inc., Plaintiff,**

v.

**CARD ACTIVATION**
**TECHNOLOGIES,**
**INC., Defendant.**

**C.A. No. 09–495–KAJ.**

United States District Court,
D. Delaware.

July 1, 2011.

Richard L. Horwitz, Esq. and David E. Moore, Esq., Potter Anderson & Corroon LLP, Wilmington, DE, of Counsel, Alan M. Fisch, Esq., Jason F. Hoffman, Esq., Coke Morgan Stewart, Esq. and R. William Sigler, Kaye Scholer LLP, Washington, DC, for Plaintiff, Stored Value Solutions, Inc., n/k/a Ceridian Stored Value Solutions, Inc.

Jack B. Blumenfeld, Esq. and Julia Heaney, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, of Counsel, J. David Wharton, Esq., Michael J. Peterson, Esq. and Nora M. Kane, Esq., Stinson Morrison Hecker LLP, Keith H. Orum, Esq. and Mark D. Roth, Orum & Roth, LLC, Chicago, IL, for Defendant Card Activation Technologies, Inc.

## MEMORANDUM OPINION

JORDAN, Circuit Judge.

### I. Introduction

Plaintiff Stored Value Solutions, Inc., doing business now as, Ceridian Stored Value Solutions, Inc. ("SVS") seeks a declaratory judgment of invalidity of U.S. Patent No. 6,032,859 (the "'859 patent"), owned by Defendant Card Activation Technologies, Inc. ("CAT"). (Docket Index ["D.I."] 1.) Before me now are SVS's Motion for Summary Judgment of Invalidity Due to Anticipation and Obviousness (D.I. 102), SVS's Motion for Partial Summary Judgment of Invalidity of Claims 20, 22–31, and 33–38 Due to Lack of Written Description (D.I. 167), CAT's Motion for Summary Judgment of Validity (D.I. 109), and CAT's Motion to Exclude the Expert Testimony of Lori Breitzke (D.I. 107). Relevant to the disposition of those motions is the construction of the term "purchase transaction" as used in the '859 patent. (*See* D.I. 134.) For the reasons that follow, including my decision on the construction of that term, I will deny both of CAT's motions, grant SVS's motion on Invalidity Due to Anticipation and Obviousness in part, and grant SVS's Motion for

Partial Summary Judgment of Invalidity of Claims 20, 22–31, and 33–38 Due to Lack of Written Description.

## II. Background

### A. Procedural Background

SVS filed a complaint seeking a declaratory judgment of invalidity of the '859 patent under 35 U.S.C. §§ 102 and 103 on July 8, 2009. (D.I. 1.) CAT filed its answer on August 13, 2009. (D.I. 9.) A report and recommendation on claim construction of nine disputed terms in the '859 patent was issued on April 28, 2010, (D.I. 61) and adopted on June 3, 2010, (D.I. 64) over CAT's objections (D.I. 62). On December 17, 2010, the parties filed their cross motions for summary judgment on validity of the '859 patent, and CAT filed its motion to exclude the testimony of SVS's expert, Ms. Breitzke. (D.I. 102, 107, 109.) At my request (D.I. 134, 138), the parties have briefed the Court on the meaning of "purchase transaction" as used in the '859 patent (D.I. 135, 136, 137, 139, 140, 141) and whether the '859 patent's written description is adequate under 35 U.S.C. § 112, ¶ 1 (D.I. 143, 144, 145, 146, 148, 149, 168, 171, 172). Oral argument on those issues was held on March 25, 2011. (D.I. 159.) On April 1, 2011, SVS filed an amended complaint, with leave of Court, alleging that, in addition to being invalid under 35 U.S.C. §§ 102 and 103, the '859 patent was also invalid for failing to meet the written description requirement of 35 U.S.C. § 112, ¶ 1. (D.I. 152). Additional expert discovery and briefing was completed on the adequacy of the written description of the '859 patent (D.I. 154, 155, 156, 157, 160, 161). The parties are scheduled to try this case before a jury beginning on July 25, 2011.

### B. The '859 Patent

The '859 patent discloses a method for processing electronic transactions which involve an ATM card, prepaid debit card, or phone card. Entitled "Method for Processing Debit Purchase Transactions Using a Counter–Top Terminal System," the '859 patent issued March 7, 2000, on an application filed September 15, 1997, and claimed priority to two provisional applications, Nos. 60/025,281 and 60/033,153, that were filed September 18, 1996 and December 13, 1996, respectively. As originally issued, the '859 patent contained thirty-eight claims, four of which were independent (claims 1, 10, 20, and 29). Pursuant to an ex parte reexamination of the patent, CAT canceled dependent claims 21 and 32 and added language from those claims to the independent claims on which they rely, claims 20 and 29, respectively. Ex Parte Reexamination Certificate No. U.S. 6,032,-859 C1, October 5, 2010, Reexamination Request No. 90/009,459, April 30, 2009.[1]

## III. Applicable Law and Standard of Review

### A. Claim Construction

"[A] district court may engage in claim construction during various phas-

---

1. Two additional ex parte reexaminations of the '859 patent by the United Stated Patent and Trademark Office ("PTO") are pending, one of which was granted in part on prior art identified by SVS's motion for summary judgment of invalidity. Reexamination Request No. 90/011,004 (granting reexam November 9, 2010 on all claims of the '859 patent except for dependent claims 4, 15, 23, and 34); Reexamination Request No. 90/011,146 (grant-ing reexam February 11, 2011 of all claims of the '859 patent relying in part on prior art cited by SVS in its motion for summary judgment of invalidity (D.I. 102)). Those reexamination proceedings have been consolidated. (D.I. 165.) A non-final office action issued May 12, 2011, in which the PTO found every remaining claim of the '859 patent invalid as either anticipated or obvious. (D.I. 165.)

es of litigation, not just in a *Markman* order," especially as "its understanding of the technology evolves." *Conoco, Inc. v. Energy & Envtl., L.C.,* 460 F.3d 1349, 1359 (Fed.Cir.2006) (internal quotations omitted) (addressing a District Court's sua sponte construction of a term). Claim construction is a matter of law. *Cybor Corp. v. FAS Technologies, Inc.,* 138 F.3d 1448, 1454–56 (Fed.Cir.1998) (en banc). "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996)). That ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," after a reading of the entire patent. *Id.* at 1313.

■ To determine ordinary meaning, the court should review the same resources as would the person of ordinary skill in the art. *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1477 (Fed.Cir.1998). Those include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed.Cir.2004).

■ Of those resources, the patent specification is "the single best guide to the meaning of a disputed term." *Phillips,* 415 F.3d at 1315 (quoting *Vitronics,* 90 F.3d at 1582). Moreover, while "the claims themselves provide substantial guidance as to the meaning of particular claim terms," "the context in which a term is used in [a] claim" and the "[o]ther claims of the patent in question" are useful for understanding the ordinary meaning of a term "[b]ecause claim terms are normally used consistently throughout the patent." *Id.* at 1314.

■ The patent specification does not stand alone, however. A court "should also consider the patent's prosecution history." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed.Cir. 1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). "Like the specification, the prosecution history provides evidence of how the [Patent and Trademark Office] and the inventor understood the patent." *Phillips,* 415 F.3d at 1317 (citing *Lemelson v. Gen. Mills, Inc.,* 968 F.2d 1202, 1206 (Fed.Cir.1992)). A court may also rely on extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman,* 52 F.3d at 980. In particular, "dictionaries, and especially technical dictionaries, ... have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology." *Phillips,* 415 F.3d at 1318 (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed.Cir.2002)).

■ However, during claim construction, "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.* at 1324. For example, extrinsic evidence is "less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed.Cir.2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n,* 366 F.3d 1311, 1318 (Fed.Cir.2004)), and extrinsic evi-

dence "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips,* 415 F.3d at 1318–19. Thus, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed.Cir.1998). For that reason, a construction should not exclude an inventor's product or a preferred embodiment. *See Osram GmbH v. Int'l Trade Comm'n,* 505 F.3d 1351, 1358 (Fed.Cir.2007) (noting that claim construction conclusion can be reinforced by the fact that alternate constructions would exclude the "products that [a] patent[ ] w[as] designed to cover"); *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n,* 75 F.3d 1545, 1550 (Fed.Cir.1996) ("[A] claim interpretation that would exclude the inventor's device is rarely the correct interpretation.").

### B. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Both the movant and non-movant must support their factual positions either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited [by another party] do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). In determining whether the asserted evidence shows that there is a genuine dispute of material fact, a court must review the evidence and draw all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 261, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *CFMT, Inc. v. Yieldup Int'l Corp.,* 349 F.3d 1333, 1337 (Fed.Cir.2003). However, a court should not make credibility determinations or weigh the evidence presented by the parties. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105(2000). Furthermore, when determining whether summary judgment is appropriate, a court "must view the evidence presented through the prism of the substantive evidentiary burden," Anderson, 477 U.S. at 254, 106 S.Ct. 2505; *see also AK Steel Corp. v. Sollac,* 344 F.3d 1234, 1238 (Fed. Cir.2003).

To defeat a motion for summary judgment after a moving party has carried its burden under Rule 56(c), the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citation omitted;; *see also Podobnik v. U.S. Postal Service,* 409 F.3d 584, 594 (3d Cir.2005) (explaining that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted)). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348 (citing former Fed.R.Civ.P. 56(e), amended Dec. 1, 2010); *see* Advisory Committee's Notes to 2010 Amendments to Fed. R.Civ.P. 56 (explaining that "[t]he standard for granting summary judgment re-

mains unchanged" after the Amendments to Rule 56 effective December 1, 2010). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (internal citation omitted).

### C. Invalidity

■ A patent is presumed valid. 35 U.S.C. § 282. The burden of establishing invalidity rests on the party asserting such invalidity and can be met only by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, — U.S. —, 131 S.Ct. 2238, 2242, 180 L.Ed.2d 131 (2011) ("We consider whether § 282 requires an invalidity defense to be proved by clear and convincing evidence. We hold that it does.").

### 1. Written Description

■ The written description requirement of 35 U.S.C. § 112, ¶ 1 provides that:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Whether a patent meets the written description requirement of 35 U.S.C. § 112, ¶ 1 is a question of fact which must be answered by clear and convincing evidence if a patent is to be invalidated. *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1347 (Fed.Cir.2011) (precedential); *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1354–55 (Fed.Cir.2010) (en banc). That question is amenable to determination at the summary judgment stage and may be based "solely on the face of the patent specification." *Centocor*, 636 F.3d at 1347; *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 927 (Fed.Cir. 2004); *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1247–48 (Fed.Cir.2002) (reversing the district court's denial of JMOL because no reasonable juror could have concluded that the asserted claim was supported by adequate written description); *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1119 (Fed.Cir.2001) (affirming grant of summary judgment of invalidity under 35 U.S.C. § 112, ¶ 1 because "[n]o reasonable juror could find that [the patentee's] original disclosure was sufficiently detailed to enable one of skill in the art to recognize that [the patentee] invented what is claimed").

■ Section 112, ¶ 1 "contains a written description requirement separate from enablement." *Ariad*, 598 F.3d at 1351. "[T]he description must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Id.* (internal quotation marks omitted). "[T]he test for sufficiency is whether the disclosure ... reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.*; *see also Carnegie Mellon Univ. v. Hoffmann–La Roche Inc.*, 541 F.3d 1115, 1122 (Fed.Cir.2008) (quoting *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir.1991)) ("[T]he applicant must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and demonstrate that by disclosure in the specification of the patent."). Such "possession as shown in the disclosure" requires "an objective inquiry into the four corners of the specification," *Ariad*, 598 F.3d at 1351, which must "describ[e] the

invention, with all its claimed limitations," *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1572 (Fed.Cir.1997) (emphasis removed). Examples or an actual reduction to practice are not necessary under the written description requirement; "a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement." *Ariad,* 598 F.3d at 1352 (citing *Falko-Gunter Falkner v. Inglis,* 448 F.3d 1357, 1366–67 (Fed.Cir.2006)). Ultimately, "the specification must describe an invention understandable to [a person of ordinary skill in the art] and show that the inventor actually invented the invention claimed." *Id.* at 1351. "A 'mere wish or plan' for obtaining the claimed invention is not adequate written description." *Centocor,* 636 F.3d at 1348 (quoting *Regents of the Univ. of Cal. v. Eli Lilly & Co.,* 119 F.3d 1559, 1566 (Fed.Cir.1997)). However, even though the "description requirement does not demand ... that the specification recite the claimed invention *in haec verba,* a description that merely renders the invention obvious does not satisfy the requirement." *Ariad,* 598 F.3d at 1352 (citing *Lockwood,* 107 F.3d at 1571–72). Therefore, "the analysis compares the claims with the invention disclosed in the specification, and if the claimed invention does not appear in the specification ... the claim ... fails regardless of whether one of skill in the art could make or use the claimed invention." *Id.* at 1348.

### 2. Anticipation

 Pursuant to 35 U.S.C. §§ 102, a claimed invention is "anticipated," and is therefore not novel if it "was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant" or "was patented or described in a printed publication in this or a foreign country or in public use or on

sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. §§ 102(a)-(b). Anticipation is a question of fact but can be amenable to summary judgment. *See Upsher-Smith Labs., Inc. v. Pamlab, LLC,* 412 F.3d 1319, 1322 (Fed. Cir.2005) (affirming grant of summary judgment in part on anticipation). "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention," and "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm.,* 339 F.3d 1373, 1377 (Fed.Cir.2003) (internal citation omitted), However, a prior art reference does not anticipate through mere disclosure of each and every limitation of a claim; it must also disclose the limitations as arranged in the claim and enable the claimed invention which it is asserted to anticipate. *Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1345 (Fed.Cir.2008) (internal citations omitted); *see also Net MoneyIN, Inc. v. VeriSign, Inc.,* 545 F.3d 1359, 1371 (Fed.Cir.2008) ("[U]nless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102.").

### 3. Obviousness

 A claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art. 35 U.S.C. § 103(a) (2006); *Gra-*

*ham v. John Deere Co. of Kansas City,* 383 U.S. 1, 13–14, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Tokai Corp. v. Easton Enters., Inc.,* 632 F.3d 1358 (Fed.Cir.2011). Whether the claimed subject matter would have been obvious at the time of invention to one of ordinary skill in the pertinent art is a question of law based on several underlying facts: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and failure of others, *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 406, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007); *Graham,* 383 U.S. at 17–18, 86 S.Ct. 684. When "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors," summary judgment on the issue of obviousness is appropriate. *KSR,* 550 U.S. at 427, 127 S.Ct. 1727.

▇▇ That question of obviousness also is not subject to any "rigid rule" that requires an express "discussion of obvious techniques or combinations" in the prior art. *KSR,* 550 U.S. at 419, 127 S.Ct. 1727. Rather, other factors, such as "market demand," "any need or problem known in the field of endeavor at the time of invention and addressed by the patent," "the inferences and creative steps that a person of ordinary skill in the art would employ," and "common sense" may evidence obvious "design trends ... that would occur in the ordinary course without real innovation." *Id.* at 418–20, 127 S.Ct. 1727. Moreover, "neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. If the claim extends to what is obvious, it is invalid under § 103." *Id.* at

419, 127 S.Ct. 1727. Simply put, "a patent's subject matter can be proved obvious by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." *Id.* at 420, 127 S.Ct. 1727.

> Before the Supreme Court's decision in *KSR,* [the Federal Circuit] required that a patent challenger show that a person of ordinary skill in the art would have had motivation to combine the prior art references and would have had a reasonable expectation of success in doing so.... *KSR,* however, instructs courts to take a more "expansive and flexible approach" in determining whether a patented invention was obvious at the time it was made. In particular, the Court emphasized the role of "common sense": "[r]igid preventative rules that deny factfinders recourse to common sense ... are neither necessary under our case law nor consistent with it."

*Wyers v. Master Lock Co.,* 616 F.3d 1231, 1240 (Fed.Cir.2010).

▇▇ However, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR,* 550 U.S. at 418, 127 S.Ct. 1727. "When determining whether a patent claiming a combination of known elements would have been obvious, we 'must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.'" *TriMed, Inc. v. Stryker Corp.,* 608 F.3d 1333, 1341 (Fed.Cir.2010) (quoting *KSR,* 550 U.S. at 417, 127 S.Ct. 1727). "Answering this question usually entails considering the 'interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to

determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.'" *Id.* at 1341 (quoting *KSR,* 550 U.S. at 418, 127 S.Ct. 1727). That factual inquiry, and "the legal determination of obviousness[,] may include recourse to logic, judgment, and common sense" and be "appropriate for resolution on summary judgment or JMOL." *Wyers v. Master Lock Co.,* 616 F.3d 1231, 1239–40 (Fed.Cir.2010); *Perfect Web Tech., Inc. v. InfoUSA, Inc.,* 587 F.3d 1324, 1329 (Fed.Cir., 2009) ("We therefore hold that … an analysis of obviousness … may include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion."); *Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.,* 555 F.3d 984, 993 (Fed.Cir. 2009) (reversing district court and granting summary judgment of obviousness).

## IV. Discussion

Before moving to the merits of the motions before me, I first address the construction of "purchase transaction" in the '859 patent.

### A. "Purchase Transaction"

■ CAT proposes that "purchase transaction" be construed as "the acquisition of goods or services by the payment of money or its equivalent; to buy." (D.I. 135 at 2.) SVS proposes that "purchase transaction" be construed as a "transaction that debits, credits, or activates a debit-styled card." (D.I. 136 at 10.) For the following reasons, I shall construe the term as "a transaction with the intended effect of decreasing the purchasing value of, increasing the purchasing value of, or activating a debit styled card."

I begin with the patent specification. *Phillips,* 415 F.3d at 1315. A "method for processing debit purchase transactions" is the method claimed by each and every claim of the '859 patent. The independent claims, which are 1, 10, 20, and 29, all directly recite "[a] method for processing debit purchase transactions." [2] ('859 pat-

---

**2.** Claims 1, 10, 20, and 29 read in full as follows:

1. A method for processing debit purchase transactions, the method comprising the steps of:

providing a counter-top terminal having telecommunications means operable with a computer, at least one keypad or data entry to the computer, a display responsive to the computer, and a card reader communicating with the computer for modifying purchasing value of a card in response to card use;

entering transaction data to the computer through keypad data entry;

reading a debit styled card through the card reader for providing card data to the computer;

entering a customer authorization code for authorizing access to a customer data base of a host data processor: [*sic*]

entering a clerk authorization code for initiating a debit purchase transaction;

electronically transmitting a transaction request to the host data processor through the telecommunications means of the counter-top terminal for requesting a response of approval or disapproval from the host data processor;

receiving a response from the host computer; and

displaying the response from the host data processor for the debit purchase transaction on the counter-top terminal display,

10. A method for processing debit purchase transactions, the method comprising the steps of:

providing a counter-top terminal having telecommunications means operable with a computer, a keypad for data entry to the computer, an alphanumeric display responsive to the computer, and a card reader communicating with the computer;

entering transaction data for a debit purchase transaction to the computer through keypad data entry;

ent at 7:46, 8:52, 9:56, 10:63.) [3] Every dependent claim recites such a method through direct reference, (8:5; 8:9; 8:13; 8:27; 8:38; 8:41; 8:48; 9:8; 9:11; 9:15; 9:19; 9:23; 9:36; 9:45; 9:48; 9:53; 10:22; 10:25; 10:39; 10:50; 10:53; 10:58; 10:60; 11:21; 11:24; 11:36; 12:1; 12:16; 12:25:

 reading a debit styled card through the card reader for transferring card data to the computer;

 entering a customer authorization code for authorizing access to a customer data base of the host data processor;

 entering a clerk authorization code for initiating a debit purchase transaction;

 communicating with a host data processor through the telecommunications means of the counter-top terminal for requesting authorization of the debit purchase transaction;

 requesting authorization of the debit purchase transaction from the host data processor; and

 receiving the authorization.

20. A method for processing debit purchase transactions, the method comprising the steps of:

 providing a counter-top terminal having telecommunications means operable with a computer, at least one keypad for data entry to the computer, a display responsive to the computer, and a card reader communicating with the computer for modifying purchasing value of a card in response to card use;

 entering sales transaction data to the computer through keypad data entry by a clerk;

 entering confirmation of the sales transaction data by a customer;

 reading a debit styled card through the card reader for providing card data to the computer;

 entering an authorization code through the keypad for having the computer initiate communication with a host data processor;

 entering a customer authorization code for authorizing access to a customer data base of a host processor; and

 entering a clerk authorization code for initiating a debit purchase transaction.

 electronically transmitting a transaction request to the host data processor through the telecommunications means of the counter-top terminal for requesting a response

of approval or disapproval from the host data processor;

 receiving a response from the host computer; and

 displaying the response from the host data processor for the debit purchase transaction on the counter-top terminal display.

29. A method for processing debit purchase transactions, the method comprising the steps of:

 providing a counter-top terminal having telecommunications means operable with a computer, a keypad for data entry to the computer, an alphanumeric display responsive to the computer, and a card reader communicating with the computer;

 entering sales transaction data by a clerk for a debit purchase transaction to the computer through keypad data entry;

 entering confirmation of the sales transaction data by a customer;

 reading a debit styled card through the card reader for transferring card data to the computer;

 entering an authorization code through the keypad for having the computer initiate communication with a host data processor;

 entering a customer authorization code for authorizing access to a customer data base of a host processor; and

 entering a clerk authorization code for initiating a debit purchase transaction.

 communicating with a host data processor through the telecommunications means of the counter-top terminal for requesting authorization of a debit purchase transaction;

 *requesting authorization of the debit purchase transaction from the host data processor;* and

 receiving the authorization.

('859 Patent at 7:46–8:44, 8:51–9:7, 9:56–10:15, 10:63–11:20; '859 Reexam Cert. 2:1–4, 2:31–4).

3. I cite to the patent as originally issued. Where language was added to claims 20 and 29 on reexamination, I cite to the reexamination certificate.

12:28; 12:34), or indirect reference, (8:46). Therefore, the definition of "purchase transaction," indeed "debit purchase transaction," must be broad enough to encompass the specific method recited in each and every claim. *See* 37 C.F.R. § 1, 75 ("Claims in dependent form shall be con-

strued to include all the limitations of the claim incorporated by reference into the dependent claim."); *General Protecht Grp., Inc. v. Int'l Trade Comm'n,* 619 F.3d 1303, 1307 n. 2 (Fed.Cir.2010) (noting that claims that depend from another have "the same limitation[s]").

CAT asserts that such "purchase transactions" are only those in which goods or services are acquired through the payment of money. (D.I. 135 at 2.) CAT is correct in asserting that those types of transactions are covered by the claims. Indeed, it is abundantly clear from the specification that the claims, and the term "purchase transaction," must be read broadly enough to encompass such transactions. The written description provides numerous examples of preferred methods in which goods are purchased and a debit card value is "debited" or "deduct[ed]." (3:26–43; 5:17–18; 6:43–44; 7:22–28.)

However, "purchase transaction" cannot be construed so narrowly as to refer only to the purchase of goods and services and the associated decrease in the value of a debit card. The claims themselves never speak of "deducting" or "decreasing" the value of a debit styled card.[4] Rather, the plain language of the claims indicates that a "purchase transaction" occurs when the value of a debit card is modified, including when it is increased. Independent claims 1 and 20 recite that the purpose of the counter-top terminal is for "modifying purchasing value of a card." (7:52–53; 9:62–63.) Claims 11 and 30 are drawn to debit purchase transactions which "compris[e] the step of *modifying a purchasing value of the card.*" (9:8; 11:21 (emphasis added).) And claims 5, 16, 24, and 35 [5] are drawn to debit purchase transactions which include the step of *"increasing the value of the debit card* by [a] credit amount." (8:36; 9:43; 10:48; 12:23 (emphasis added).) Therefore, the definition of "purchase transaction" must include transactions in which the purchasing value of a debit card is modified, including through an increase.

---

**4.** I adopt the convention of the patent (*see, e.g.,* 7:56) and write the term "debit styled" as a non-hyphenated compound adjective.

**5.** Claims 5, 16, 24, and 35 read in full as follows:

5. The method according to claim 1, wherein the transaction request transmitting step comprises the steps of:
requesting a credit increase for use with the debit card;
receiving a credit amount from customer;
entering the credit amount into the computer using the keypad;
transmitting credit amount data representative of the credit amount received to the host data processor;
increasing the value of the debit card by the credit amount.

16. The method according to claim 10, wherein the transaction request transmitting step comprises the steps of:
entering a credit amount into the computer using the keypad;
transmitting the credit amount received to the host data processor; and
increasing the value of the debit card by the credit amount.

24. The method according to claim 20, wherein the transaction request transmitting step comprises the steps of:
requesting a credit increase for use with the debit card;
receiving a credit amount from customer;
entering the credit amount into the computer using the keypad;
transmitting credit amount data representative of the credit amount received to the host data processor; increasing the value of the debit card by the credit amount.

35. The method according to claim 29, wherein the transaction request transmitting step comprises the steps of:
entering a credit amount into the computer using the keypad;
transmitting the credit amount received to the host data processor; and
increasing the value of the debit card by the credit amount.

The written description of the '859 patent further reinforces that point. A preferred embodiment of a claimed method is described as "a debit card having a certain value" being *"increased in value ... once the balance is depleted or is insufficient for the purchase."* (5:14, 5:28–30 (emphasis added).) The written description also provides an example of a method where *"value is to be added"* to a debit styled card (7:13) *before* (7:12–20) a "purchase is to be made" with the card (7:19–20), as described by the steps labeled 401, 404, 406, 408, and 410 in Figure 6 (7:11–17), in a complete transaction separate from the "purchase" of any goods. Thus, the claims and written description clearly indicate that a "purchase transaction" encompasses a transaction in which the purchasing value of a debit-styled card is increased, a transaction which can occur completely separate from the purchase of any goods.

In addition, the written description also includes other "purchase transaction" methods which do not concern the purchase of goods, decreasing the purchasing value of a debit styled card, or even increasing the purchasing value of a debit styled card. It describes preferred embodiments of the claimed methods for "making an account active" (4:16) for "Phone Debit cards" (3:56) and for the "purchase and activation of cellular styled phones" (4:48–49) and "cellular activation" (4:59–60), as illustrated by Figure 4 (4:59), These examples, which appear to be drawn as preferred embodiments for claims 4, 15, 23, and/or 34, indicate that activating a debit purchase transaction is necessarily part of what the patent specification refers to as a "purchase transaction" too.[6]

Therefore, "[b]ecause claim terms are normally used consistently throughout the patent," *Phillips*, 415 F.3d at 1314, and the patent specification is "the single best guide to the meaning of a disputed term," *Phillips*, 415 F.3d at 1315, the term "purchase transaction" should be construed broadly enough to encompass methods for processing transactions "with the intended effect of decreasing the purchasing value of, increasing the purchasing value of, or activating a debit styled card."

I recognize that such a construction would, as CAT points out, expand the ordinary meaning of "purchase," which is "to buy." (D.I. 135 at 2.) I am also aware of the various parts of the '859 patent's written description which address the purchase of goods and services.[7] I am, however, very reluctant to construe "purchase transaction" in a manner that would eliminate preferred embodiments for claims 4, 5, 15, 16, 23, 24, 34, and 35. *See Osram*, 505

---

**6.** It cannot be the case that use of a debit card to purchase a phone card is what makes the preferred method concerning phone cards "purchase transactions," for the written description specifically states that cash or credit cards can be used to purchase those debit-styled cards. (3:64–66.) In other words, the debit purchase transaction regarding phone cards that is described in the written description is one in which a phone card is purchased by some means and activated. Thus, the definition of "purchase transaction" must encompass "activation," or else the activation of phone cards in the methods covered by claims 4, 15, 23, and 34 would not be the very "purchase transactions" the patent describes them to be in those claims, by reference to independent claims.

**7.** The written description includes the following passages: "allowing [merchants] to accept all credit and ATM cards for the purchase of goods or services" (Abstract); "ATM/Debit transactions are performed in a manner that is familiar to the customer using their ATM or debit card ... customer selects a product, takes it to the sales counter" (3:26–29); "ATM transaction card terminal for the purchase of goods and services" (1:56–57); and "Gold card will be good for purchase in the restaurant or for long distance calls" (6:36–37).

F.3d at 1358. Therefore, regardless of the ordinary meaning of "purchase transaction," it is clear that the term must include transactions for decreasing as well as increasing the purchasing value of a debit styled card, and transactions for activating a debit styled card.

The extrinsic record evidence further supports such a construction. Namely, CAT's own expert, Dr. Grimes, whom CAT has put forth as one of ordinary skill in the art, described claim 5 as covering the return of a good to a store in a transaction which occurs separately from a purchase and one which "increases the value in [an] account by whatever the cost of the [good] was." (D.I. 137, Ex. E, Grimes Dep. at 107:2–3.) CAT counters that Dr. Grimes stated that a return transaction is covered under claim 5 because the return transaction "must occur in conjunction with a purchase transaction as set forth in Claim 1." (D.I. 137, Ex. E, Grimes Dep. at 107 11–12.) So, according to CAT, a return transaction is covered by claim 5 only after a "purchase transaction" occurs under claim 1, i.e., "the dependent claim step of a credit transaction (increasing the value of the card by return of product, void of purchase, or otherwise adding value to the card) is optional, which is consistent with the use and purpose of a dependent claim," (D.I. 139 at 4.)

That argument assumes that claim 5 has a requirement that the method in claim 1 be performed first. However, claim 5 describes an entirely new method that, while dependent on claim 1, stands on its own. *See Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1384 (Fed.Cir.2001) (acknowledging that dependent claims stand on their own); *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve Inc.*, 796 F.2d 443, 446 (Fed.Cir.1986) ("each claim shall be presumed valid independently of the validity of other claims"). Moreover, claim

5 states that the transaction data transmitting step of claim 1 is replaced, indicating that only a single transaction is ever processed. (8:27–28.) Thus, it appears, without any meaningful qualification, that Dr. Grimes believes a return transaction during which the account associated with a debit card is increased in value is a method covered by claim 5. SVS's expert, Ms. Breitzke, agrees. "One of ordinary skill in the art would recognize the 'debit purchase transaction' disclosed in the '859 patent as including multiple types of transactions, including return transactions." (D.I. 104, Ex. B, Breitzke Rebuttal Report at 6.) Therefore, since claim 5 covers a method for processing debit purchase transactions, such transactions must include those in which the account associated with a debit card is to be increased in value, such as a return transaction.

Despite the intrinsic and extrinsic evidence, CAT argues that the principle of claim differentiation weighs heavily against a construction of the term "purchase transaction" that includes transactions for increasing the purchasing value of a debit styled card or for activating the card. CAT asserts that such a construction would make claims 4 and 5 superfluous because claim 1 would already include those transactions. That argument misses the mark. First, claim 1 is written as an open-ended method claim. (7:47 ("method *comprising* the steps of:")-) Claims 4 and 5 specify certain limitations in a new method. Construing "purchase transaction" to include increasing the purchasing value of a debit card or activating a debit card would not make claims 4 and 5 superfluous, but would prevent them from being read narrowly on only transactions in which goods are purchased, which the written description indicates should not be the case. (7:11–20) (describing a transaction in which *value is to be added* to a debit styled card (7:13) *before*, (7:12–20) a

"purchase is to be made" with the card (7:19–20), as described by the steps labeled 401, 404, 406, 408, and 410 in Figure 6 (7:11–17), in a complete transaction separate from the purchase of any goods (emphasis added).)

Second, the principle of claim differentiation stands for the proposition that "different words or phrases used in separate claims are presumed to indicate that the claims have a different meaning and scope." *Karlin Tech., Inc. v. Surgical Dynamics, Inc.,* 177 F.3d 968, 971–72 (Fed. Cir.1999). Here, we are reading the same term, "purchase transaction" as applying in the same manner to two claims. If we were to read the term as CAT suggests, we would narrow the scope of the term to a point where preferred embodiments disclosed in the written description would no longer be covered by any claim. Claim differentiation does not support CAT's argument.

Therefore, the intrinsic and extrinsic evidence counsel in favor of construing the term "purchase transaction" as "a transaction with the intended effect of decreasing the purchasing value of, increasing the purchasing value of, or activating a debit styled card." Although somewhat different than the ordinary meaning of "purchase," that construction is the most reasonable one that would preserve the scope of the claims in the '859 patent and ensure that each preferred embodiment described in the patent is covered by a claim of the patent.

## B. CAT's Motion to Exclude the Testimony of SVS's Expert

■ I consider next CAT's motion to exclude the testimony of SVS's expert Lori Breitzke, whom SVS seeks to have opine on the validity of the '859 patent. For the following reasons, I will deny CAT's motion and allow Ms. Breitzke's testimony.

The standard for admitting expert testimony is set forth in Rule 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

Before admitting such testimony, federal judges must exercise a gatekeeping role, ensuring that any testimony heard by a jury satisfies the requirements of Rule 702. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Third Circuit has explained that Rule 702 has three requirements; (1) the expert must be qualified, (2) the methodology must be reliable, (3) and the proposed testimony must fit the facts of the case.[8] *United States v.*

---

8. Because the admissibility of expert testimony is an evidentiary ruling not unique to patent law, I apply Third Circuit law. *See, e.g., Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1276 (Fed.Cir.1999) (explaining that where "evidentiary rulings raise procedural issues not unique to patent law, this court applies the law of the regional circuit where appeals from the district court would normally lie"); *Pitney Bowes, Inc. v. Hewlett–Packard*

*Co.,* 182 F.3d 1298, 1308 n. 2 (Fed.Cir.1999) ("Rule 702's gatekeeper function, as discussed in *Kumho Tire [Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ], relates solely to the admissibility of evidence."); *Medtronic Inc. v. Boston Scientific Corp.,* 777 F.Supp.2d 750, 766–67, 2011 WL 1193381, *10 (D.Del. Mar. 30 2011) (applying Third Circuit law to determine the

*Schiff,* 602 F.3d 152, 172–73 (3d Cir.2010). I address each of those requirements below.

### 1. Qualification

Since 1987, Ms. Breitzke has worked in the field of payment systems and point-of-sale devices. (D.I. 104, Ex. A., Breitzke Report at 1.) During that time, she has helped design hardware and software products for processing point-of-sale transactions. (*Id.*) Presently, she is Chairperson for the Electronic Transactions Association Education Committee, which represents companies in the electronic transaction processing industry, and she is the owner of E & S Consulting, LLC, which provides consulting services for companies in the industry. (*Id.* at 1–2.) Based on that work history, Ms. Breitzke is qualified "by knowledge, skill, experience, training, or education," Fed. R.Evid. 702, to opine on the '859 patent and the prior art and to help the jury make the necessary comparisons between the two.

CAT does not challenge Ms. Breitzke's qualification as an expert with respect to the electronic transaction industry or point-of-sale devices but, nonetheless, argues that Ms. Breitzke is unqualified because she lacks knowledge of basic patent principles and of the legal requirements for anticipation, obviousness, and written description. Ms. Breitzke is not being offered as an expert on patents, however. She is offered as an expert on point-of-sale transactions and devices. Her role is not to educate the jury on the requirements of patent law, but to help the jury understand the point-of-sale technology, to understand how a person of skill in the art would view

the specification, and to make a factual comparison between the claimed invention and the prior art. I will then instruct the jury on applying the law to the facts as the jury finds them. While it is necessary that Ms. Breitzke's testimony be sufficiently tethered to the law so as to be relevant and reliable which will be addressed below-her lack of expertise in patent law does not affect her qualification as an expert on the electronic transaction industry or on point-of-sale technology. Consequently, I find Ms. Breitzke sufficiently qualified to render the she has tendered.

### 2. Reliability

In her reports, Ms. Breitzke sets forth the methodology she intends to use in demonstrating that the '859 patent is anticipated, obvious, or lacks a written description of the invention.[9] With respect to anticipation, she notes that "a claim is invalid when a single prior art reference . . . existed prior to the claim's priority date and teaches every element of the claim;" she sets forth an accurate description of the various forms prior art can take; and she explains that her opinion will demonstrate "how every element of the '859 patent was known and described in a particular prior art reference." (D.I. 104, Ex. A., Breitzke Report at 25.) Her report then employs the methodology as described, identifying each element of every patent claim, comparing those elements to various prior art references, and explaining how, in her opinion, each claimed element is present in a particular prior art reference. (D.I. 104, Ex. A., Breitzke Report at 10, 35–57.) That approach is consistent with the Federal Circuit's instruction that "a claim is anticipat-

admissibility of expert testimony on patent infringement).

**9.** I consider the reliability and fit of Ms. Breitzke's opinions as a whole and do not

address whether, after my decision on summary judgment, there remains anything for Ms. Breitzke to opine on at trial.

ed if each and every limitation is found either expressly or inherently in a single prior art reference," *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed.Cir.1998), and hers is, therefore, a reliable method for assisting the jury to decide the question of anticipation.[10]

With respect to obviousness, Ms. Breitzke's report notes that "a patent cannot be obtained if the differences between the subject matter to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention to a person having ordinary skill in the art;" she correctly recognizes that "the combined teachings of more than one prior art reference can be used to demonstrate that all of the elements of a claim were known;" and she explains that her opinion will show "how the combined teachings of two particular prior art references disclose each claim element of the '859 patent ... [and] why one of ordinary skill in the art would combine the teachings of the particular references." (D.I. 104, Ex. A., Breitzke Report at 25–26.) This approach reflects the statutory description of obviousness and is consistent with Federal Circuit precedent.

*See* 35 U.S.C. § 103; *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1325–27 (Fed.Cir.2008). It is, therefore, a reliable method for establishing obviousness.

Finally, with respect to written description, Ms. Breitzke's report outlines her understanding that "the specification must contain a written description of the invention"; that a proper analysis "compares the claims with the invention disclosed in the specification ... from the view of a person of ordinary skill in the art"; and that while "the specification need not describe the claimed invention verbatim" it must do more than "make it obvious to a person of ordinary skill in the art." (D.I. 169, Ex. A., Breitzke Report (April 2011) at 6.) Then, Ms. Breitzke identifies each limitation in the relevant steps of the claims,[11] compares those limitations to the invention disclosed in the written description, and explains why, in her opinion, a person of ordinary skill in the art would or would not find in the written description the limitation as asserted in the claims. That approach reflects the Federal Circuit's instruction that the specification must "describ[e] the invention, with all its

---

10. CAT claims that Ms. Breitzke's testimony should be excluded because it fails to discuss the requirement for an anticipating prior art reference to disclose the patented elements "arranged or combined in the same way recited in the claims." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed.Cir. 2008). While Ms. Breitzke's reports do not use the word "arrangement," I am satisfied that she opines not only that the prior art "disclose[s] all elements of the claim[s] ... but ... also disclose[s] those elements arranged as in the claim." *Id.* (internal quotation marks omitted). CAT also claims that Ms. Breitzke's testimony should be excluded for failing to discuss the enablement requirement. At least with respect to the MicroTrax manual, it is clearly enabled because it thoroughly describes a device that had been in public use already. Whether or not she has shown that other prior art references are en-

abled does not affect the admissibility of her testimony because the fact that her opinion might have covered other aspects of anticipation does not render her opinion unreliable with respect to what it does cover. The same is true of CAT's argument that Ms. Breitzke has failed to address reasonable probability of success on the question of obviousness. Likewise, if CAT's arguments are characterized as challenging the "fit" of Ms. Breitzke's testimony, the fact that her opinion might have covered other areas does not, in this case at least, render her opinion unhelpful with respect to what it does cover.

11. Ms. Breitzke limited her opinion to whether the "customer authorization code," "clerk authorization code," and general "authorization code" steps of the claims are present in the written description.

claimed limitations," *Lockwood,* 107 F.3d at 1572, and that "the analysis compares the claims with the invention disclosed in the specification, and if the claimed invention does not appear in the specification ... the claim ... fails regardless of whether one of skill in the art could make or use the claimed invention." *Ariad,* 598 F.3d at 1348. It is, therefore, a reliable method for analyzing the written description.

### 3. Fit

An expert's opinion has the necessary "fit" for a case when it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Schiff,* 602 F.3d at 173 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). Each part of Ms. Breitzke's opinion is dedicated either to describing the patent and the prior art or to comparing the patented claims to the prior art and to the invention disclosed in the specification. That is sufficiently tied to the facts to aid in resolving whether the '859 patent is anticipated or rendered obvious by the prior art discussed in Ms. Breitzke's report and whether there is a written description of the claimed invention.[12]

Because Ms. Breitzke is a qualified expert, her methodology is reliable, and her opinion fits the facts of this case, CAT'S motion to exclude her testimony is denied.[13]

---

12. CAT makes two other arguments related to fit that are unpersuasive and do not affect my decision. First, CAT argues that Ms. Breitzke's opinion regarding obviousness of the independent claims lacks fit because it consists of "nothing more than a series of stock, conclusory statements" and "would not be helpful to a lay jury." (D.I. 108 at 12–13.) Although the portion of Ms. Breitzke's report explicitly opining on obviousness of the independent claims is sparse, her conclusions therein are supported by her detailed opinion on anticipation of those claims, *see Eolas Techs. Inc. v. Microsoft Corp.,* 399 F.3d 1325, 1335 (Fed.Cir.2005) (explaining that expert testimony regarding anticipation "might also support an argument of obviousness in the alternative"), and by her opinion on obviousness of the dependent claims, *see Callaway Golf Co. v. Acushnet Co.,* 576 F.3d 1331, 1344 (Fed.Cir.2009) ("A broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness."). Thus, that testimony will not be excluded.

Finally, CAT suggests that Ms. Breitzke's opinion does not fit because it is based on an incorrect claim construction. In her deposition, Ms. Breitzke had stated that the "clerk authorization code" and "customer authorization code" could make up the "general authorization code." (D.I. 125, Ex. R., Breitzke Dep. at 105:15–19.) According to CAT, that conflicts with Judge Stark's construction of general authorization code as "broader than the 'customer authorization code' and 'clerk authorization code' terms." (D.I. 108 at 15.) I find no inconsistency. Saying that the "broader" general authorization code might sometimes consist of a clerk or customer authorization code is little different than saying that a rectangle might sometimes be a square. CAT also argues that Ms. Breitzke's opinion is inconsistent with a proper construction of "debit purchase transaction." For the reasons discussed *supra* Part IV(A), I do not find Ms. Breitzke's opinion to be inconsistent with my construction of that term.

13. CAT also renews its earlier request that the court strike Ms. Breitzke's rebuttal report based on CAT's allegation that the report contains new matter not covered in her initial report or in rebuttal of Dr. Grimes report. Although Judge Stark already addressed this issue, finding "that Breitzke's Rebuttal Report does not contain impermissible 'new' opinions," (D.I. 89 at 3), CAT claims that Ms. Breitzke admitted in her later deposition that she did "offer a new opinion ... in [her] rebuttal report." (D.I. 108 at 19 (quoting D.I. 125, Ex. R., Breitzke Dep. at 234:1–2).) CAT does not identify any specific "new" opinion in Ms. Breitzke's rebuttal, however, and a closer examination of Ms. Breitzke's deposition reveals that the "new" opinion to which she referred was offered "to rebut what Dr. Grimes said in his report." (D.I. 125 Ex. R., Breitzke Dep. 236:16–17.) Thus, there is no basis to disturb Judge Stark's finding.

## C. Written Description

A bit of additional background information is necessary to put the following discussion in context. Pursuant to an ex parte reexamination, dependent claims 21 and 32 of the '859 patent were canceled and the steps in those claims requiring entering of a clerk authorization code and a customer authorization code were incorporated as additional steps in the respective independent claims on which they rely, namely claims 20 and 29. *Ex Parte Reexamination Certificate No.* U.S. 6,032,-859 C1, October 5, 2010, Reexamination Request No. 90/009,459, April 30, 2009. Thus, after the reexam, independent claims 20 and 29 require three separate and distinct authorization codes to be entered: (1) a customer authorization code must be entered ('859 Reexam Cert. 2:1–2, 2:31–32); (2) a clerk authorization code must be entered by a clerk ('859 Reexam Cert. 2:3–4, 2:33–34; D.I. 61 at 20–21); and (3) a general authorization code must be entered through a keypad ('859 patent at 10:3–5, 11:11–13). Claims 20 and 29 also require the step of "entering confirmation of the sales transaction data by a customer." ('859 patent at 9:66–67, 11:6–7). The written description in the '859 patent, however, does not disclose any one method that includes all three of the code entering steps or any one method that includes all three of the code entering steps and the sales transaction data confir-

mation step.[14] Therefore, I will grant SVS's Motion for Partial Summary Judgment of Invalidity of Claims 20, 22–31, and 33–38 Due to Lack of Written Description (D.I. 167).[15]

### 1. CAT's Objections

Despite the amendment of claims 20 and 29 during reexamination, CAT objects to this Court raising *sua sponte* the potential invalidity of claims 20 and 29 of the '859 patent for failing to meet the written description requirement of 35 U.S.C. § 112, ¶ 1. It argues that SVS has waived that issue under Federal Rule of Civil Procedure 8(c) by failing to plead it in SVS's original complaint. CAT further asserts that it was improper for me to grant leave to SVS to amend its complaint to include the allegation that claims 20 and 29 of the '859 patent are invalid under § 112, ¶ 1. (D.I. 144, 148.) Since all of this additional labor has been a result of CAT's decision to amend its claims during reexamination, it takes some chutzpah to mount those objections, but I will address them.

**a. Under Rule 56(f), It Was Proper to Invite a Summary Judgment Motion on the Written Description Issue and to Rule on that Motion**

Contrary to CAT's objection, it was proper under Federal Rule of Civil Procedure 56(f) to raise the written description issue *sua sponte*. The newly amended

---

**14.** It appears then that CAT's recrafting of claims 20 and 29 during reexamination may have resulted in the inclusion of new matter (the three code process). That point raises the interesting question of whether such an amendment during reexamination was even permissible. As open-ended claims, the independent claims of the patent would have read on any method adding a new step to the claims. However, another method that included new, non-obvious novel steps would have been independently patentable as an improvement although infringing of the '859 patent if practiced. Therefore, if the new matter add-

ed during reexamination (the three code process) was non-obvious novel matter, CAT would have broadened the scope of the claims for purposes of invalidity, but not infringement. Whether that is permissible in reexamination is questionable, but that argument has not been raised here, and, in any event, I need not address it because the claims fail for lack of written description.

**15.** SVS's motion is to invalidate independent claims 20 and 29 and dependent claims 22–28, 30, 31, and 33–38.

Rule 56(f) provides that "[a]fter giving notice and a reasonable time to respond, the court may.... grant [a] motion [for summary judgment] on grounds not raised by a party; or ... consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. CiV. P. 56(f). The Committee's Notes explain the scope, content, and purpose of that amendment to the Rules in more detail:

> Subdivision (f) brings into Rule 56 text a number of related procedures that have grown up in practice. After giving notice and a reasonable time to respond the court may grant summary judgment ... *on legal or factual grounds not raised by the parties;* or consider summary judgment on its own. In many cases *it may prove useful first to invite a motion* ....

FED. R. CIV. P. 56(f) Advisory Committee's Notes (2010) (emphasis added). The written description issue was a legal ground not raised by either party, and I invited a summary judgment motion on it. By the plain language of Rule 56, it was well within the power and discretion provided by Rule 56 to raise the written description issue *sua sponte.* Fed.R.Civ.P. 56(f).

Because CAT was given ample "notice and opportunity to respond" to the potential invalidity of claims 20 and 29 for failing to meet the written description requirement of § 112, ¶ 1, I can now properly rule on the invited motion. At my request (D.I. 138), the parties filed opening, answering, and reply briefs addressing whether the '859 patent's written description is adequate under 35 U.S.C. § 112, ¶ 1 (D.I. 143, 144, 145, 146, 148, 149, 168, 171, 172). Oral argument on that issue was held on March 25, 2011. (D.I. 159.) Additional expert discovery was completed on the issue. (D.I. 154, 155, 156, 157, 160, 161). Another round of briefing was permitted after that discovery in order to allow the parties to address the adequacy of the written description of the '859 patent in briefing that would benefit from that expert discovery. (D.I. 168, 171, 172). Moreover, the timing of the discovery and briefing that followed oral argument matched that which CAT represented to the Court would eliminate any possible prejudice and provide adequate time for it to address the adequacy of the written description for claims 20 and 29 of the '859 patent. (D.I. 159, transcript of March 25, 2011 hearing, 74:14-21 ("THE COURT: But in terms of prejudice ... is there anything else that would have to happen besides that two months to open the record ... MR. PETERSON: Your Honor, not that I can think of as far as-you know, it can be done, your Honor....").) Thus, given the additional discovery and briefing, CAT has not been prejudiced by my raising the written description issue, ruling on SVS's invited summary judgment motion is appropriate. *See* Fed.R.Civ.P. 56(f); *see also Ultra–Precision Mfg., Ltd. v. Ford Motor Co.,* 411 F.3d 1369, 1376–77 (Fed. Cir.2005). (affirming a district court's allowance of a federal patent law preemption affirmative defense that was invoked for the first time in a defendant's motions in limine, after the district court had raised the issue *sua sponte* in denying defendant's motion for summary judgment and permitted the parties to submit briefing and participate in oral argument on the issue).

#### b. SVS Has Not Waived the Written Description Issue Under Rule 8(c)

CAT asserts that 35 U.S.C. § 282(3) requires defenses involving the validity or infringement of a patent to be pleaded. CAT points out that the Federal Circuit held in a non-precedential opinion, *Bradford Co. v. Jefferson Smurfit Corp.,* 2001

WL 35738792, *9 (Fed.Cir. Oct. 31 2001), that § 282(3) is the "patent statute's analogy" to Federal Rule of Civil Procedure 8(c). (D.I. 146 at 3.). Therefore, as CAT sees it, SVS's failure to raise a 35 U.S.C. § 112, ¶ 1 claim in its original pleadings precludes it from asserting that claim now. *See Systems, Inc. v. Bridge Elecs. Co.*, 335 F.2d 465, 466 (3d Cir.1964) ("An affirmative defense which is neither pleaded as required by Rule 8(c) nor made the subject of an appropriate motion under Rule 12(b) is waived.").

Assuming that the strictures of Rule 8(c) apply, I conclude that SVS has not waived its written description argument. "Regional circuit law governs the question of waiver of a defense." *Ultra–Precision*, 411 F.3d at 1376 (Fed.Cir.2005). "Courts in [the Third] Circuit ... have taken a more forgiving approach to parties who fail to raise affirmative defenses in an answer, as courts have held that the failure to raise an affirmative defense by responsive pleading or appropriate motion does not always result in waiver." *Sultan v. Lincoln Nat'l Corp.*, 2006 WL 1806463, at *13 (D.N.J. June 30, 2006) (citing *Prinz v. Greate Bay Casino Corp.*, 705 F.2d 692 (3d Cir.1983)).

> Under Fed.R.Civ.P. 15(a), a responsive pleading may be amended at any time by leave of court to include an affirmative defense, and leave shall be freely given when justice so requires. Unless the opposing party will be prejudiced, leave to amend should generally be allowed .... It has been held that a defendant does not waive an affirmative defense if [h]e raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.

*Charpentier v. Godsil*, 937 F.2d 859, 863–64 (3d Cir.1991) (internal quotation marks and citations omitted); *see also Chainey v.*

*Street*, 523 F.3d 200, 210 n. 5 (3d Cir.2008) ("The purpose of requiring the defendant to plead available affirmative defenses in his answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and an opportunity to demonstrate why the affirmative defense should not succeed."); *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d Cir.2006) (stating that "affirmative defenses can be raised by motion, at any time (even after trial), if plaintiffs suffer no prejudice"). To determine if an affirmative defense has been waived:

> [T]he District Court must exercise its discretion and determine whether there was a reasonable modicum of diligence in raising the defense. The District Court must also consider whether the plaintiff has been prejudiced by the delay.... In particular, the Court must inquire whether the defendants violated any scheduling orders in raising the defense for the first time in their summary judgment motions, whether they delayed asserting the defense for tactical purposes or any improper reason, and, most important, whether the delay prejudiced the plaintiff's case.

*Eddy v. Virgin Islands Water and Power Auth.*, 256 F.3d 204, 210 (3d Cir.2001) (reversing and remanding a District Court's holding that a defendant had waived the affirmative defense of qualified immunity by raising it for the first time on summary judgment).

Here, SVS did not fail to raise the written description issue to gain a tactical advantage; CAT has not been prejudiced by SVS's failure to raise the issue in the original complaint; and justice requires that this Court find the claim has not been waived. I, not SVS, raised the written description issue for the first time, and I did so based on CAT's amendment of the patent. (D.I. 138). SVS could not have

predicted for tactical purposes that I would raise the issue. Because of the additional discovery and briefing I ordered, CAT has had a full opportunity to address the written description issue here. Again, it was CAT's actions during the ex parte reexamination of the '859 patent, which concluded more than a year after the filing of the original complaint, that has created the written description problem now at issue. Thus, it would be unjust to say that SVS has waived its right to assert that claims 20 and 29 of the '859 patent are invalid under § 112, ¶ 1. *See, e.g., Ultra–Precision,* 411 F.3d at 1376–77; *Kleinknecht v. Gettysburg College,* 989 F.2d 1360, 1373–74 (3d Cir.1993) (considering immunity defense under Pennsylvania's Good Samaritan law that defendant raised for the first time in its summary judgment motion); *Charpentier,* 937 F.2d at 864 (permitting a New Jersey Tort Claims Act-based immunity affirmative defense raised for the first time by a defendant who joined a co-defendant's trial brief).

### c. It Was Proper for the Court to Grant Leave to SVS to Amend Its Complaint

Pleadings may be amended at any time before trial with leave of court, which should be provided freely "when justice so requires." Fed.R.Civ.P. 15(a). Here, as discussed above, justice requires that SVS be permitted to amend, since CAT took actions after the filing of the original complaint that created the grounds for SVS to amend. The amendment to the complaint here, however, also is effectively a change to the scheduling order in this case, which provided that amendments to pleading be completed by December 10, 2009. (D.I. 16 at 3.) Motions to amend which operate to change the scheduling order must comply not only with Rule 15(a) but also with Federal Rule of Civil Procedure 16(b). *E. Minerals & Chems. Co. v. Mahan,* 225 F.3d 330, 340 n. 18 (3d Cir.2000). Rule 16(b)(4) requires consent of the Court and that good cause exist before amending a scheduling order. FED. R. CIV. P. 16(b)(4). Whether a party sought amendment of the pleading in a diligent and timely manner is properly considered by the Court when determining if good cause exists. *Samick Music Corp. v. Delaware Music Indus., Inc.,* 1992 WL 39052, at *6–7 (D.Del. Feb. 12, 1992). The decision to permit amendment, however, rests squarely with the discretion of the Court. *Mahan,* 225 F.3d at 339–40.

In this case, good cause exists. CAT's amendments to claims 20 and 29 came after the deadline for amending pleadings under the scheduling order had already passed. (*See* D.I. 16; Ex Parte Reexamination Certificate No. U.S. 6,032,859 C1, October 5, 2010, Reexamination Request No. 90/009,459, April 30, 2009.) The timing of the amendments made during reexamination and the interest of judicial efficiency weigh in favor of finding good cause to grant SVS leave to amend its pleading to include the averment that claims 20 and 29 of the '859 patent are invalid under 35 U.S.C. § 112, ¶ 1.

### 2. Written Description Analysis [16]

 Independent claims 20 and 29, and the claims that depend from them, fail to meet the written description requirement in 35 U.S.C. § 112, ¶ 1. As noted above, after reexam, independent claims 20 and 29 require three separate and distinct authorization codes to be entered: (1) a customer authorization code must be entered

---

**16.** SVS has not asserted that independent claims 1 and 10 are invalid under 35 U.S.C. § 112, ¶ 1.

('859 Reexam Cert. 2:1–2, 2:31–32); (2) a clerk authorization code must be entered by a clerk ('859 Reexam Cert. 2:3–4, 2:33–34; D.I. 61 at 20–21); and (3) a general authorization code must be entered through a keypad ('859 patent at 10:3–5, 11:11–13). Claims 20 and 29 also require the step of "entering confirmation of the sales transaction data by a customer." ('859 patent at 9:66–67, 11:6–7). However, I cannot discern in the '859 patent any method that includes all three of the code entering steps or any one method that includes all three of the code entering steps and the sales transaction data confirmation step.

The written description of the '859 patent consists almost exclusively of detailed descriptions of five preferred embodiments of the claimed methods which, along with the accompanying figures, provide the sole references outside of the claims to authorization codes. Those preferred embodiments are methods for processing: (1) ATM/Debit purchase transactions; (2) phone card purchase transactions; (3) cellular telephone purchase (i.e., activation) transactions; (4) prepaid debit purchase transactions; and (5) hybrid prepaid debit/phone card purchase transactions. The following is a list of the relevant claimed steps disclosed and not disclosed in the written description for each of those preferred methods. As outlined, each embod-

iment is missing at least one of the required elements of claims 20 and 29.

### a. ATM/Debit Transactions

*Relevant steps disclosed:*

1. Customer authorization code must be entered: customer enters PIN number. (3:34.)
2. Sales transaction data confirmation by a customer: "customer will have the option to confirm" (3:36)

*Relevant steps not disclosed:*

1. Clerk authorization code must be entered by a clerk.
2. General authorization code must be entered through a keypad.

### b. Phone Card Transactions

*Relevant steps disclosed:*

1. Customer authorization code must be entered.[17]

 a. Once paid, customer or clerk swipes phone card through the reader to read the encoded account number which can be magnetic stripe, bar code, OCR characters, or chip based card memory. (3:67–4:10.) Pursuant to the claim construction opinion adopted by this Court, reading the account number on the card might be read as entering a customer authorization code. (*See* D.I. 61 at 16–20.) [18]

---

**17.** The written description does state that a "customer can pay in either cash, ATM/Debit Card or credit card. If any 'cashless' method of payment is selected it will be processed first in the way described above [for ATM/Debit transactions]." (3:65–67.) If the step of payment with an ATM card is read as part and parcel with this method, then the customer authorization code and customer confirmation of sales transaction data steps are satisfied because that payment method, as shown above, discloses the entry of a customer authorization code. However, the description

clearly states that the cashless method payment is processed "first" (3:67), and the flow chart referenced by the disclosure shows that the cashless method of payment is a completely separate transaction, (Fig, 2).

**18.** I am, of course, viewing all facts in the light most favorable to CAT on summary judgment. I note, however, that it is a strained reading to say that the account number is the customer authorization code. Both claims 20 and 29 include the separate step of "reading a debit styled card through the card reader for providing card data to the computer." (10:1–

2. Clerk authorization code must be entered by a clerk: clerk enters and confirms collected amount for payment with "an authorization number." (4:10–12.)

*Relevant steps not disclosed:*

1. General authorization code must be entered through a keypad.[19]

2, 11:9–10.) It seems implicit then that the "card data" (10:2; 11:9), which would appear to be the account number, is not the customer authorization code.

19. In response to SVS's motion for summary judgment on written description, CAT asserts that a general authorization code is disclosed by the "terminal ID" (4:13, D.I. 171 at 5–6, 1449.) CAT's argument boils down to its claim that the terminal ID is a general authorization code because "[i]t is a precondition for establishing communication with a host computer." (D.I. 171 at 6.) CAT confuses the ultimate effect of the terminal ID with the purpose of it. The terminal ID is not entered "to establish a communication link with a host data processor," as required by the Court's construction of the term. (D.I. 61 at 28.) Nor is it entered "for having the computer initiate communication with the host data processor," as required by the language of the claims themselves. (10:3–5, 11:11–15.) As CAT expressly states, "[t]he purpose of a terminal ID is to inform the host data processor from which merchant and terminal the communication is coming." (D.I. 171 at 6; *see also* D.I. 170, Ex. I, Dep. of J. Grimes at 40:9–17, 154:7–17 (CAT's expert Grimes describing the terminal ID as "an address for the terminal so that the message ... gets routed to the correct terminal" and clearly explaining that the entry of the terminal ID does not cause anything to happen, including calling a host).) While the effect of entering the terminal ID might ultimately be that a communication link is successfully established, ignoring the purpose of entering the code would cause any other series of numbers and/or letters entered during a debit purchase transaction to become a general authorization code if the transaction would not proceed without them. That exceptionally broad definition would include such "preconditions" to communication with a host data processor as entry of sales transaction data by a clerk, entry of confirmation sales transaction data by a customer, entry of a PIN number by a customer, or any number of other conceivable series of letters and/or numbers that could ever be entered during a transaction, e.g. the entry of an employee ID number or the entry of a code to power on a countertop terminal. Simply put, the plain language of the claims requires the general authorization code to be entered for a particular purpose, that is "for having the computer initiate communication with a host data processor." (10:3–5, 11:11–13.) A terminal ID does not have that purpose, as CAT appears to acknowledge. (D.I. 171 at 6.) No reasonable jury could conclude otherwise,

Furthermore, even if CAT were correct that the general authorization code is disclosed in the phone card transaction method, the '859 patent still lacks adequate written description under § 112, ¶ 1. Section 112, ¶ 1 requires a patent to "describ[e] the invention, with *all* its claimed limitations." *Lockwood,* 107 F.3d at 1572 (emphasis added and removed). Put another way, the possession requirement contained in § 112, ¶ 1 demands that the written description of a patent must "show that the inventor actually invented *the invention claimed*"; it is not adequate to show the existence of *individual elements* of a claimed invention in a variety of separate and distinct inventions that, when taken together, would "merely render[] the invention obvious." *Ariad,* 598 F.3d at 1351–52 (emphasis added). The phone card transaction method described in the written description does not contain the step of entering customer confirmation of sales transaction data. The step of entering confirmation of the sales transaction data is not inherent in any other step described as occurring in the phone card transaction. Indeed, it was even considered novel by the PTO to combine the step of entering customer confirmation of sales transaction data with the step of entering confirmation of the sales transaction data by a clerk. *See Grant of Reexam,* 90/011,146 at 4, Feb. 11, 2011. Therefore, regardless of whether the phone card transaction method contains the step of entering a general authorization code, the description of that transaction method *still* is not an adequate description of the claimed invention in 20 or 29 that includes all of the claimed limitations. *See Lockwood,* 107 F.3d at 1572. Assuming then, for the sake of argument, that CAT is correct and the general authorization code is disclosed, no reasonable

2. Customer confirmation of sales amount.[20] In this preferred embodiment, the clerk, not the customer, confirms sales transaction data. (4:11–12.)

### c. Cellular Phone Activation Transactions

*Relevant steps disclosed:*

1. Clerk authorization code must be entered by a clerk: the clerk is prompted to collect amount and confirm that it was collected by entering an authorization code on the remote keypad. (4:66–5:1.)

*Relevant steps not disclosed:*

1. Customer authorization code must be entered.[21]

2. General authorization code must be entered through a keypad.

3. Sales transaction data confirmation by a customer.[22]

### d. Prepaid Debit Transactions

*Relevant steps disclosed:*

1. None.

*Relevant steps not disclosed:*

1. Clerk authorization code must be entered by a clerk.

2. Customer authorization code must be entered.[23]

3. General authorization code must be entered through a keypad.

4. Sales transaction data confirmation by a customer.[24]

### e. Hybrid Prepaid Debit/Phone Card Transactions

*Relevant steps disclosed:*

1. Clerk authorization code must be entered by a clerk. A decision is made to add value to card or not (7:12–13):

 a. *"If no value is to be added to the card and a purchase is to be made 412,*[25] the clerk enters the amount of the purchase and activates the system for transmitting."* (7:19–21, emphasis added.) The clerk might "activate the system" with a code.[26]

 b. *"If value is to be added,* an amount is selected 404, payment is made to the clerk wherein the clerk confirms that payment has been made 406."* (7:13–15, emphasis added.) The clerk might confirm payment by entering a clerk authorization code.

*Relevant steps not disclosed:*

1. Customer authorization code must

---

jury could conclude that the '859 patent has disclosed that the inventors of the '859 patent reasonably conveyed to those skilled in the art that they were in possession of the invention claimed in claims 20 and 29 to clearly allow a recognition that the inventors invented what is claimed. *See Ariad,* 598 F.3d at 1351.

20. *See supra* note 17.

21. *See supra* note 17.

22. *See supra* note 17.

23. *See supra* note 17.

24. *See supra* note 17.

25. The numbers in bold are included in the text of the patent and refer to numbers on the Figures.

26. It might be read that the clerk could also "activate" the system by entering the general authorization code. CAT has previously asserted however, that the step referred to here is the entry of a clerk authorization code. (D.I. 145, Ex. H, CAT Response to Office Action in Ex Parte Reexamination 90/009,045 at 7 ("the clerk activates the system (e.g., by entering a clerk authorization code)").)

be entered.[27]

2. Saks transaction data confirmation by a customer.[28]

3. General authorization code must be entered through a keypad.

Therefore, the written description does not contain any explanation, description, or disclosure whatsoever of a method for processing debit purchase transactions which includes the step of entering a general authorization code. Nor does it contain such disclosure of any method which includes the all the steps of entering a clerk authorization code by a clerk, entering a customer authorization code, entering a general authorization code through a keypad, and entering sales transaction data confirmation by a customer.

Those steps are not unimportant to the novelty and nonobviousness of the claimed methods. On September 28, 1999, the PTO issued a Notice of Allowance which stated the following reasons for allowance:

The best prior art of record, Gutman et al., Nair et al., and Levine et a.l, taken alone or in combination fails to specifically teach or fairly suggest the steps of entering a customer [code *sic*] authorizing access to a customer data base of a host processor, and entering a clerk authorization code for initiating a debit purchase transaction; and the steps of entering sales data by the clerk, and entering confirmation of the sales data from the customer as set forth in the claims.

See *Grant of Reexam*, 90/011,146 at 4, Feb. 11, 2011.

Those reasons for allowance are clearly associated with claims 1 and 10 as a pair and claims 20 and 29 as a pair. Simply put, claims 1 and 10 were allowed as novel and nonobvious because they contained the limitation of entering both a clerk and customer authorization code, and claims 20 and 29 were allowed as novel and nonobvious because they contained the limitation of the clerk entering sales data and the customer confirming that sales data. (The original examiner of the '859 patent application found that the general "authorization code" of claims 20 and 29 did not make them patentable material. *March 8, 1999 Office Action* (rejecting claims over Gutman patent which taught the entry of the general authorization code); see *Markman Report and Recommendation* (D.I. 61 at 19.).)

During the more recently completed reexamination of the '859 patent, claims 20 and 29 were rejected as originally drafted as being anticipated by U.S. Patent No. 5,278,752 ("*Narita*"). CAT responded to that rejection by asserting that *Narita* failed to disclose "entering an authorization code." *Reexam Final Rejection* at 4, Reexam No. 90/009,459, May 27, 2010. The reexaminer rejected that argument, however, finding "Narita's disclosure of a customer entering his PIN as the entering of the authorization code" because "[a] PIN by its nature is used to authorize a transaction by authenticating the card holder as an authorized user of the account." *Id.* at 6–7. The reexaminer did, though, allow dependent claims 21 and 32 over Narita because Narita discloses only that a clerk would enter an "article code," such as a UPC code or other "product identifier" to initiate a transaction, which the PTO concluded was not a clerk authorization code. *Id.* at 8.

After the final rejection letter, CAT mailed a copy of the claim construction order to the PTO and proposed amending claims 20 and 29 to include all the claims

---

27. *See supra* note 17.

28. *See supra note* 17.

of dependent claims 21 and 32 and cancelling those dependent claims. *Response to Final Rejection* at 2–3, Reexam No. 90/009,459, June 10, 2010. In its response to the final rejection, CAT asserted that "claims 21 and 32 were patentable/confirmed because 'the clerk authorization code for initiating a debit purchase transaction' limitation in those claims is not taught or suggested by the cited *Narita* reference." *Id.* at 4.

CAT did not, however, merely suggest replacing the "entering an authorization code" step in the independent claims with that of entering both the clerk and the customer authorization codes. It *added* both steps to the independent claims. Whatever may have been the motivation for that addition,[29] it resulted in claims 20 and 29 as written today, which require three separate and distinct codes to be entered and a customer to confirm the sales transaction data entered by a clerk.

Because no single method for processing debit purchase transactions in which those four steps are included is described,[30] the written description in the '859 patent does not describe the methods claimed in independent claims 20 and 29 sufficiently to allow a reasonable jury to determine that those claims are supported by a written description that would "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, [the patentee] was in possession of the invention." *Centocor*, 636 F.3d at 1348 (internal quotation marks omitted); *see Carnegie Mellon*, 541 F.3d at 1122. That conclusion is proper at the summary judgment stage and, as here, may be based "solely on the face of the patent specification." *Centocor*, 636 F.3d at 1347. Therefore, claims 20 and 29, and their respective dependent claims,[31] i.e., claims 22–28, 30, 31, and 33–38, are invalid pursuant to 35 U.S.C. § 112, ¶ 1.

### D. Anticipation

 SVS asserts that the MicroTrax Ltd. Electronic Payment Software, PC Electronic Payment Systems Reference Manual ("MicroTrax Manual" or the "Manual") (D.I. 106 Ex. A–4) anticipates claims 1–3, 5–14, 16–20, 22, 24–31, 33, and 35–38 of the '859 patent. (D.I. 103 at 3–20.) The Manual was distributed with the MicroTrax Ltd. Electronic Payment Software which was used by retailers in a point-of-sale system to permit, among other things, the use of Automated Teller Machine

---

**29.** It appears that eliminating the "entering an authorization code" step from claims 20 and 29 would have contradicted the position CAT took during *Markman* briefing that there were three distinct codes claimed in the patent. *See Markman Report and Recommendation* (D.I. 61 at 23; *CAT Markman Brief* D.I. 44 at 32.)

**30.** Again, those four steps are: (1) a customer authorization code must be entered ('859 Reexam Cert. 2:1–2, 2:31–32); (2) a clerk authorization code must be entered by a clerk ('859 Reexam Cert. 2:3–4, 2:33–34; D.I. 61 at 20–21); (3) a general authorization code must be entered through a keypad ('859 patent at 10:3–5, 11:11–13); and (4) "entering confirmation of the sales transaction data by a customer" ('859 patent at 9:66–67, 11:6–7).

**31.** None of the claims remaining after reexamination that depend on claims 20 or 29 alter the manner in which the limitations in claim 20 and 29 that the claimed method must include the steps of entering a clerk authorization code by a clerk, entering a customer authorization code, entering a general authorization code through a keypad, and entering sales transaction data confirmation by a customer. Therefore, they are likewise invalid under § 112, ¶ 1 for lack of written description. *See LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345–47 (Fed.Cir.2005) (invalidating dependant claims when the independent claim was invalid under § 112 ¶ 1).

("ATM") cards by customers to purchase and return goods. (Manual at 2–14; D.I. 106 Ex. A, Lineck Dep. at 13:11–13; 17:12–19.) One of the founders of MicroTrax Ltd., Mr. Lineck, testified that the Micro-Trax Ltd. Electronic Payment Software supported by the Manual was installed in at least 30 grocery stores in California in 1989 (Lineck Dep. at 19:2–6), that the Manual was provided to those customers (Lineck Dep. at 17:25–18:21), and that the version of the Manual provided to customers in 1989 included all of the transaction types listed at page 2–14 of the Manual (Lineck Dep. at 55:9–56;8).[32] Moreover, the physical copy of the Manual before the Court bears copyright insignia dated 1994 and 1995 (Manual at cover page bearing Bates number L000003, rear cover bearing Bates number L000381), consistent with testimony by Mr. Lineck that the software supported by the Manual was updated in 1995. Therefore, there is no reasonable dispute that the Manual qualifies as § 102(a) prior art because it is relevant to the field of electronic payment systems and was printed and disseminated to the public before the undisputed presumed earliest invention date in this case, September 18, 1996.[33] *Bausch & Lomb,* 796 F.2d at 449 (explaining that "the date of invention [is] presumed to be the filing date of the application until an earlier date is proved").

Claims 1–3, 5–7, 9–14, and 16–19 are invalid as anticipated by the Manual under 35 U.S.C. § 102(a).[34] The Manual discloses two relevant methods for processing debit card purchase transactions: one for the purchase of goods with the OMNI 490 ("ATM Purchase" transaction) and one for the return of goods using the OMNI 490

**32.** Because the Manual thoroughly describes a device that had been in public use already, no reasonable jury could conclude that it is not enabling.

**33.** CAT asserts that the Manual cannot be prior art because Lineck's testimony that it was publicly known cannot be corroborated by documentary evidence. (D.I. 123 at 9–13). CAT relies on a line of cases in which the Federal Circuit has held that a supposed inventor's testimony alone cannot serve to invalidate a patent without corroborating evidence such as documentation of sale or invention. (D.I. 123 at 9, citing, among other cases, *Adenta GmbH v. OrthoArm, Inc.,* 501 F.3d 1364, 1371 (Fed.Cir.2007)). CAT misapplies that precedent here. The corroboration requirement arises primarily from the concern that "[c]onception ... be proved by corroborating evidence which shows that the inventor disclosed to others his completed thought expressed in such clear terms as to enable those skilled in the art to make the invention," as the Federal Circuit explained in *Coleman v. Dines,* 754 F.2d 353, 359 (Fed. Cir.1985) (internal quotations omitted). SVS is not relying solely on Mr. Lineck's testimony as a claim that he was the first inventor of the inventions claimed in the '859 patent. SVS is relying on Mr. Lineck's testimony to support the reasonable inference that a user manual for software dated 1995 was known to the public in 1995. Mr. Lineck's testimony to that fact does not itself require corroboration. CAT has chosen to contradict Mr. Lineck's testimony and the physical copy of the Manual in the record not with opposing factual evidence but with a twisted reading of Federal Circuit precedent that would require fact witnesses to-as a matter of law-provide documentary evidence to support any testimony they give regarding a printed piece of prior art. Mr. Lineck's testimony stands unopposed in the record that the Manual's copyright dated 1995 accurately indicates the latest date at which the public would have reasonably been expected to know the contents of the Manual. SVS need not provide corroborating evidence to Mr. Lineck's corroborating testimony that the Manual was known to the public at the latest in 1995.

**34.** Because I have found claims 20, 22, 24–31, 33, and 35–38 to be invalid for failing to provide adequate written description required under 35 U.S.C. § 112 ¶ 6, I do not address SVS's assertions that those claims are invalid as anticipated.

("ATM Return" transaction).[35] In those methods, the Manual discloses each and every limitation of the methods in claims 1–3, 5–7, 9–14, and 16–19 as arranged in those claims, as shown below.

### Claim 1:

Each and every element of claim 1 is anticipated by both the ATM Purchase and ATM Return transactions disclosed by the Manual, as shown as follows:

- **A method for processing debit purchase transactions**

Combining the constructions of the Court, "debit purchase transactions" are "transactions with the intended effect of decreasing the purchasing value of, increasing the purchasing value of, or activating a [card having a value in an associated account or a value stored on the card itself] made using a [card having a value in an associated account or a value stored on the card itself]."[36] (*Supra* part IV(A); D.I. 61 at 15.) The ATM Purchase and ATM Return methods disclose a method that "electronically processes the payment of goods at the point-of-sale" (Manual at 2:14[37]) and the value of the account associated with an ATM card is decreased (2:15–2:19) or increased (2:28–2:31) after "a customer slides an ATM card." (2:14, 2:29).

[the method comprising the steps of:]

- **providing a counter-top terminal having telecommunications means operable with a computer,**

The Court has defined "telecommunications means" as a means-plus-function element with the function being "communicating with a host data processor" and the associated structure being a "modem or its equivalent." (D.I. 61 at 10.) The Manual discloses that the OMNI 490 with checker display is a counter-top terminal, (2:1–4) having telecommunications means operable with a computer[38] ("[t]he transaction [using the OMNI 490] is routed through the Micro-Trax controller via a telephone line connection to the host processor for approval," (2:14); the OMNI 490 "[g]enerates authorization requests, sends them ·to the EPS network via the store controller, and displays the host response," (2:1); the OMNI 490 communicates with the store controller over a local area network, LAN, (1:62–63, 4:1–3; 5:1–9)).

- **at least one keypad for data entry to the computer, a display responsive to the computer, and a card**

---

**35.** Given the Court's construction of "purchase transaction," the method for crediting the account associated with an ATM card described in the Manual as an ATM Return transaction is a "method for processing debit purchase transactions" within the meaning of the claims of the '859 patent: it is a "transaction[ ] that increase[s] the purchasing value of ... a debit styled card [an ATM card]." *See supra* Part IV(A).

**36.** The bracketed language is the Court's construction of the term "debit styled card." (D.I. 61 at 15.)

**37.** In this section, for ease of use, I refer to pages in the Manual by reference to the chapter and page numbers in the document itself, i.e. 2:14 means Chapter 2 of the Manual at page 14. Unless otherwise stated in a citation in this section, these citations are to the Manual, not the '859 patent.

**38.** Whether "operable with a computer" is interpreted to mean that the terminal itself is a computer or that it operates with an external computer, such as the controller, the OMNI 490 is operable with a computer. (*See* 1:4 (referring to the controller as an "EPS computer"), 5:1–12 (describing the terminal as having an operating system, memory, and a LAN address).) For the same reason, I find unpersuasive CAT's argument that Ms. Breitzke failed to address this point. (D.I. 110 at 5–6.)

**reader communicating with the computer**

The Manual discloses that the OMNI 490 has at least one keypad for data entry (1:75, 2:3–6; 2:14, 2:16), a display responsive to the computer (2:18–19, 2:30–31), and a card reader for communicating with the computer (2:15, 2:20, 2:29).

- **for modifying purchasing value of a card in response to card use,**

The Court has defined "purchasing value of a card in response to card use" as "a value stored on a card itself or a value in an account associated with a card (but not limited to situations where the card holder has a business arrangement with the host data processor." (D.I. 61 at 16.)) The Manual discloses that the ATM Purchase and ATM Return transactions are methods in which the OMNI 490 with checker pad counter-top terminal is used for modifying the value of the account associated with an ATM card by decreasing such value (2:15–2:19) or increasing such value (2:28–2:31) after "a customer slides an ATM card" (2:15, 2:29).

- **entering transaction data to the computer through keypad data entry**

The Manual discloses that transaction data is entered to the computer through keypad data entry: "[t]he purchase amount and cashback amount, if any, are entered by the checker on the checker device located in the lane" (2:14; *see also* 2:16–17) or a checker enters the amount of return (2:30) through a keypad (2:30).

- **reading a debit styled card through the card reader for providing card data to the computer**

The Court has construed "debit styled card" to include ATM cards. (D.I. 61 at 10–15.) In both relevant debit purchase

transaction methods disclosed by the Manual, an ATM card is read through the card reader for providing card data to the computer. (2:1, 2:14, 2:15, 2:29.)

- **entering a customer authorization code for authorizing access to a customer data base of a host data processor**

The Court has construed that step as "a series of numbers and/or letters, or a combination thereof, which may be entered via the keypad by the customer or may be on the card itself, for authorizing access to a customer data base of a host data processor" (D.I. 61 at 20), which includes a PIN number associated with an ATM card. (D.I. 61 at 17.) In both relevant debit purchase transaction methods disclosed by the Manual, an ATM card PIN number is entered by a customer through a keypad of the OMNI 490. (2:1, 2:3, 2:14, 2:15–16, 2:29.)

- **entering a clerk authorization code for initiating a debit purchase transaction;**

The Court has construed that step as "the clerk enters a series of numbers and/or letters, or a combination thereof, which permits the initiation of a debit purchase transaction." (D.I. 61 at 21.) The entry of the clerk authorization code does not have to be through a keypad. (D.I. 61 at 21.) In both relevant debit purchase transaction methods disclosed by the Manual, a clerk authorization code is entered.

In both transactions, a "1 to 9 digit number" "checker ID" is entered by a checker to "open[ ] the [OMNI 490] lane equipment and allow[ ] the terminal to accept electronic payments." (2:7, 2:8–10.) Thus, the Manual discloses the entry of a clerk authorization code.

CAT makes two unpersuasive arguments why the checker ID could not be

the clerk authorization code. First, it asserts that the checker ID is not required for every transaction, i.e. the clerk does not have to reenter the code for each transaction. (D.I. 123 at 24.) That argument, however, ignores the fact that entering the checker ID is a necessary step to proceed with, at a minimum, the first transaction a checker completes. (2:15, 2:28.)

Second, CAT asserts that the checker ID is "at best, a disclosure of the 'general authorization code' as set forth in [claims 20 and 29 of] the '859 Patent" (D.I. 123 at 25), an argument with which its expert agrees (D.I. 105 Ex. G, Grimes Rebuttal Report, at 17–18).[39] To support its contention, CAT points to an office action issued during the prosecution of the '859 patent, during which the examiner found that a "password [to be] entered [by a user] before proceeding with other functions of the device" anticipated the "general authorization code." (D.I. 123 at 24 with language added from U.S. Pat. No. 5,221,838 ("*Gutman*"); *see* D.I. 43, Ex. D, March 9, 1999 Office Action at SVS000190 (finding

the general authorization code to be anticipated by *Gutman* at 7:59–8:18).) CAT's reliance on the examiner's finding, however, is unpersuasive, since the examiner did not benefit from this Court's claim construction nor did he ever state that the password in *Gutman* could not also function as the clerk authorization code in a claim that does not include a general authorization code.[40] Regardless of what the examiner's position may have been, though, CAT's argument that the checker ID could only be the general authorization code ignores the plain function of the checker ID, which is to permit a debit transaction to occur. The checker ID is the code entered by a checker to "allow[ ] the terminal to accept electronic payments" (2:7), such as those detailed by the ATM Purchase and ATM Return transaction methods, which is the function of the OMNI 490 counter-top terminal. Clearly, the checker ID does not initiate communication with a host data processor, as required of the general authorization code, but initiates the de-

39. Although I consider Dr. Grimes's reports in my opinion, they are not properly in the record on summary judgment. It has been black letter law in the Third Circuit for over two decades that a "purported expert's report is not competent to be considered on a motion for summary judgment" if the "report was not sworn to by the alleged expert." *Fowle v. C & C Cola,* 868 F.2d 59, 67 (3d Cir.1989) (citing to *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (holding that an unsworn statement does not satisfy Rule 56(e).)). Unlike the substance of Ms. Breitzke's report (*see* D.I. 104; D.I. 169), the substance of Dr. Grimes's report was not sworn to by its author (see D.I. 105, Ex. G; D.I. 171, Ex. 1). Therefore, Dr. Grimes's expert report is not competent evidence at this point. *See Fowle,* 868 F.2d at 67; *supra* note 8 (explaining that Third Circuit law governs admissibility of expert opinion); *see also Garside v. Osco Drug,* *Inc.,* 895 F.2d 46, 50 (1st Cir.1990) (excluding expert report from consideration on summary judgment when the substance of the expert report was not sworn to by expert); *Sarmiento v. Montclair State Univ.,* 513 F.Supp.2d 72, 83 n. 6 (D.N.J.2007) (same); *Rockwell Tech., LLC. v. Spectra–Physics Lasers, Inc.,* 2002 WL 523390 at *3 (D.Del. Apr. 8; 2002) (unpublished) (same). Nevertheless, although it would be proper here to hold CAT to the well-established requirements of Rule 56, I will treat Dr. Grimes's opinions as being part of the record, at least at this juncture.

40. When faced with *Gutman,* the examiner did find the clerk authorization code to be allowable matter in the same office action, but only when accompanied by the additional step of entering a customer authorization code. (D.I. 43, Ex. D, March 9, 1999 Office Action at SVS000193).

bit purchase transaction, as required of the clerk authorization code.

Therefore, I agree with the opinion of SVS's expert Ms. Breitzke (D.I. 104, Ex. A, Breitzke Report at 40; D.I. 104, Ex. B, Breitzke Rebuttal Report at 2–6.) that the checker ID is the clerk authorization code, and no reasonable jury could find otherwise unless it ignores the plain function of the checker ID.[41]

- **electronically transmitting a transaction request to the host data processor through the telecommunications means of the counter-top terminal for requesting a response of approval or disapproval from the host data processor;**

The Court has construed "requesting a response of approval or disapproval from the host data processor" to mean "requesting that the host data processor approve or disapprove a debit purchase transaction." (D.I. 61 at 25–26.) The Manual discloses that "[t]he transaction [using the OMNI 490] is routed through the MicroTrax controller via a telephone line connection to the host processor for approval," (2:14), the OMNI 490 "[g]enerates authorization requests, sends them to the EPS network via the store controller, and displays the host response," (2:1); and the OMNI 490 communicates with the store controller over a local area network, LAN, (1:62–63, 4:1–2; 5:1–9.) The Manual discloses that those actions are done for both relevant methods disclosed. (2:18–19, 2:31.)

- **receiving a response from the host computer; and**

The Manual discloses that a response is received from the host computer in both relevant methods. (2:14 ("If the transaction is approved, a receipt is printed. If the transaction is declined, the checker device displays a reason for the denial."); 2:18–19 ("host sends back an" "Approved Message" or a "Declined message" after which "a receipt is generated on the printer" or "[t]he message contained in the Controller's Response Code Conversion File is displayed"); 2:31 ("Approval/Decline is the same as in ATM card processing. APPROVED: The host sends back an "Approved" message. A receipt is generated on the printer. If NED [sic], the lane equipment displays a message described in the Controller's Response Code Conversion File.").)

---

**41.** In the ATM Return transaction, a "manager's ID must be entered" (2:31), which is a numeric code up to nine digits long (1:15) that is "used to ok [the] transaction[ ]" (1:15). As SVS points out, the manager's ID also functions as a clerk authorization code in the ATM Return method. (D.I. 103 at 7.) Claim 1 is open-ended; it states that the claimed method "comprises the steps of." Therefore, a method for processing debit purchase transactions, such the ATM Return method disclosed in the Manual, may include an additional step of entering a second "clerk authorization code." CAT argues that the manager's ID cannot be the clerk authorization code because an ATM Return transaction is not a debit purchase transaction within the meaning of the '859 patent's claims, because a clerk would not know the manager's ID, and because it is entered by a manager, which CAT believes is beyond the definition of clerk authorization code construed by the Court, i.e. "the *clerk* enters a series of numbers...." (D.I. 123 at 25–27.) However, as already discussed above, the ATM Return transaction described in the Manual is a "purchase transaction" within the meaning of the '859 patent's claims. *See supra* note 35. Moreover, there is no discernible prohibition in the Manual against a clerks' knowing the manager's ID, nor any instruction that a manager cannot act as a clerk during an ATM Return transaction. Therefore, CAT has not identified any genuine issue of material fact that the manager's ID cannot serve as the clerk authorization code.

- **displaying the response from the host data processor for the debit purchase transaction on the counter-top terminal display**

The Manual discloses that an "Approved" (2:18–19, 2:31) or "Declined" message (2:19, 2:31) is displayed.

In light of the foregoing, I conclude that claim 1 is anticipated by both the ATM Purchase and ATM Return methods for processing debit purchase transactions described in the Manual.

*Claim 2:*

Dependent claim 2 includes all of the steps of independent claim 1, but adds two further steps which are also anticipated by the ATM Purchase method disclosed in the Manual:

- **entering sales data by the clerk; and**

The Manual discloses that "[f]he purchase amount and cashback amount, if any, are entered by the checker on the checker device located in the lane." (2:14; *see also* 2:16–17.)

- **entering confirmation of the sales data from the customer**

The Manual discloses that "[t]he total is displayed to the customer for approval. The customer PRESSES the key labeled [Yes] or the key labeled [No]." (2:17.)

Therefore, claim 2 is anticipated by the ATM Purchase method for processing debit purchase transactions disclosed by the Manual.

*Claim 3:*

Dependent claim 3 includes all of the steps of independent claim 1, but adds one further step which is also anticipated by

both the ATM Purchase and ATM Return methods disclosed in the Manual:

- **printing a debit transaction receipt in response to a print command from the computer**

The Manual discloses that "[i]f the transaction is approved, a receipt is printed." (2:14, *see also* 2:18, 2:31.)

Therefore, claim 2 is anticipated by the ATM Purchase and ATM Return methods for processing debit purchase transactions disclosed by the Manual.

*Claim 5:*

Dependent claim 5 includes all of the steps of independent claim 1, except that the "transaction request transmitting step" in claim 1 comprises five new steps, which are also anticipated by the ATM Return method disclosed in the Manual:

- **requesting a credit increase for use with the debit card; receiving a credit amount from the customer; entering the credit amount into the computer using the keypad; transmitting credit amount data representative of the credit amount received to the host data processor; increasing the value of the debit card by the credit amount.**

The Manual discloses a method for processing ATM Returns in which a "return amount" is received from a customer (2:30),[42] that amount is entered by a checker through a keypad (2:30), that return amount "information is sent to the controller" (2:31) which then approves or declines the credit to the ATM account (2:31).

Therefore, claim 5 is anticipated by the ATM Return method for processing debit

---

42. CAT concedes that in the "dependent claim step of a credit transaction," the value of the debit card can be increased by "return of a product, void of a purchase, or otherwise adding value to the card." (D.I, 139 at 4.)

purchase transactions disclosed by the Manual.[43]

*Claim 6:*

Dependent claim 6 includes all of the steps of independent claim 1, except that the "card reading step" in claim 1 comprises a new step, which is also anticipated by the ATM Purchase and ATM Return methods disclosed in the Manual:

- **swiping the card through the card reader**

 The Manual discloses that a customer's ATM card is read by the OMNI 490 terminal "when a customer slides [it] . . . through a card reader located at the right side of the terminal." (2:14; see also 2:15, 2:29.)

Therefore, claim 6 is anticipated by the ATM Purchase and ATM Return methods for processing debit purchase transactions disclosed by the Manual.

*Claim 7:*

Dependent claim 7 includes all of the steps of independent claim 1, but adds an additional step and alters the "transaction data entering step" in claim 1 to "include" a new step. Both of those changes are anticipated by the ATM Purchase and ATM Return methods disclosed in the Manual:

- **providing a remote keyboard communicating with the terminal unit, and wherein the transaction data entering step includes the step of entering data through the keyboard**

The Manual discloses a remote "checker display" with a keyboard through which the checker enters transaction data. (2:16, 2:30.)

Therefore, claim 7 is anticipated by the ATM Purchase and ATM Return methods for processing debit purchase transactions disclosed by the Manual.

*Claim 8:*

Dependent claim 8 includes all of the steps of dependent claim 7, but adds an additional requirement:

- **wherein the remote keyboard comprises a hand-held styled keyboard**

The Manual discloses a remote "checker device" with a keyboard through which the checker enters transaction action data. (2:16, 2:30.) The Manual, however, does not indicate that the "checker device" is handheld. SVS's expert asserts that the picture of the checker device indicates that it is handheld. (D.I. 104, Ex. A at 94.) Although it does not appear that CAT has yet presented admissible expert opinion in rebuttal on that point, without the benefit of a clear and definite explanation by Ms. Breitzke why she believes the picture indicates that the checker device is handheld, a rational trier of fact could find the SVS has failed to carry its burden by a preponderance of the evidence.

Therefore, whether claim 8 is anticipated because the Manual's discloses that the checker device is hand-held is a "genuine

---

43. For anticipation of this claim and claims 16, 24, and 35–SVS cites to the ATM return transaction method disclosed by the Manual which uses the Tranz 340 terminal unit instead of the OMNI 490. (D.I. 103 at 9–10, 14, 16, 19.) The ATM return transaction method for the terminals is very similar (*Compare* 3:39–43 *with* 2:28–31; *see also* 3:1–19). While it appears that the ATM return method disclosed by the Manual which uses the Tranz 340 terminal unit also anticipates claims 5, 16, 24, and 35, I do not address that point any further because I find those claims anticipated by the ATM Return Method, which uses the OMNI 490. My conclusions regarding anticipation are, thus, based on transactions methods which use the OMNI 490.

issue for trial."[44] *Cf. Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

*Claim 9:*

Dependent claim 9 includes all of the steps of dependent claim 1, but requires the host data processor to be a particular type of processor, one of which is anticipated by the ATM Purchase and ATM Return methods disclosed in the Manual:

- **wherein the host data processor includes one of a credit authorization provider, a phone card provider, and a telephone switch**

Neither SVS nor CAT offers a clear interpretation of the limitations added by this claim. The language "one of supports interpreting the claim as requiring that the host data processor be any one of the three types listed that is, it could be a host data processor for a credit authorization provider, *or* a phone card provider, *or* a telephone switch." Alternatively, the use of the word "and" supports interpreting the claim as requiring that the host data processor be all three of the types listed-that is, it must be a host data processor for a credit authorization provider, *and* a phone card provider, *and* a telephone switch. SVS implicitly argues that it is the former, asserting that the Manual anticipates claim 9 by disclosing a method in which the host data processor is a credit authorization provider. (D.I. 103 at 12.) SVS's expert agrees with that reading of the claim. (D.I. 104, Ex. A, Breitzke Report at 19.) Apparently, the PTO does as well. (D.I. 165, May 12, 2011 Non-Final Office Action at 6) ("The 'phone card provider' and 'telephone

switch' are optionally recited and carry no patentable weight."). CAT does little to oppose that reading, simply stating in a conclusory manner that it disputes SVS's contention that claim 9 is anticipated. (D.I. 123 at 5.)

Although the claim is not easily deciphered, I believe SVS and the PTO have identified the better reading. To interpret the claim otherwise would effectively write "one of out of the claim, something I am unwilling to do." Thus, I interpret claim 9 as listing three independent specific types of host data processors, any one of which may be the "host data processor" as used in claim 1.[45]

The Court has previously construed "credit authorization provider" as "a service provider that maintains the value associated with a debit styled card." (D.I. 61 at 26.) The Manual discloses a method that "electronically processes the payment of goods at the point-of-sale" (Manual at 2:14) which includes a request for the host data processor to decrease (2:15–2:19) or increase (2:28–2:31) the value of the account associated with an ATM card. (2:14).

Therefore, claim 9 is anticipated by both the ATM Purchase and ATM Return methods disclosed in the Manual, which utilize a host data processor of a credit authorization provider for processing debit purchase transactions.

*Claim 10:*

Independent claim 10 is substantially similar to independent claim 1, differing in

---

44. For that reason, I will also deny CAT's motion for summary judgment of validity of claim 8.

45. I recognize that an argument could be made that my interpretation renders claim 9 largely redundant in light of claim 1, which would appear to encompass any kind of host data processor. Nonetheless, to interpret the language "one of to actually mean" all three of would put more weight on the word "and" then it can bear, and I must interpret the claims as they are written.

only the following minor ways, which are also anticipated by the ATM Purchase and ATM Return methods disclosed in the Manual:

- **a keypad for data entry to the computer, an alphanumeric display responsive to the computer**

The word "a" when used in a claim that is written in open form indicated by the term of art "comprising," such as claim 10, means "one or more." *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed.Cir. 2008). The Manual discloses that the OMNI 490 has one or more keypads for data entry (1:75, 2:3–6; 2:14, 2:16) and an alphanumeric display responsive to the computer (2:17–19, 2:30–31).

- **a card reader communicating with the computer**

The Manual discloses that the OMNI 490 has a card reader for communicating with the computer (2:15, 2:18, 2:29).

- **reading a debit styled card through the card reader for transferring card data to the computer**

The Court has construed "debit styled card" to include ATM cards. (D.I. 61 at 10–15.) In both relevant debit purchase transaction methods disclosed by the Manual, an ATM card is read through the card reader for providing card data to the computer. (2:1, 2:14, 2:15, 2:29.)

- **communicating with a host data processor through the telecommunications means of the counter-top terminal for requesting authorization of the debit purchase transaction, requesting authorization of the debit purchase transaction from the host data processor;**

The Manual discloses that "[t]he transaction [using the OMNI 490] is routed through the MicroTrax controller via a telephone line connection to the host processor for approval," (2:14); the

OMNI 490 "[g]enerates authorization requests, sends them to the EPS network via the store controller, and displays the host response," (2:1); and the OMNI 490 communicates with the store controller over a local area network, LAN, (1:62–63, 4:1–2; 5:1–9). The Manual discloses that those actions are done for both relevant methods disclosed. (2:18–19, 2:31.)

- **and receiving the authorization**

The Manual disclose that a response is received from the host computer in both relevant methods. (2:14 ("If the transaction is approved, a receipt is printed. If the transaction is declined, the checker device displays a reason for the denial."); 2:18–19 ("host sends back an" "Approved Message" or a "Declined message" after which "a receipt is generated on the printer" or "[t]he message contained in the Controller's Response Code Conversion File is displayed"); 2:31 ("Approval/Decline is the same as in ATM card processing. APPROVED: The host sends back an "Approved" message. A receipt is generated on the printer. If NED [sic], the lane equipment displays a message described in the Controller's Response Code Conversion File.").)

Therefore, claim 10 is anticipated by both the ATM Purchase and ATM Return methods for processing debit purchase transactions described in the Manual.

*Claim 11:*

Dependent claim 11 includes all of the steps of independent claim 10, but adds one further step which is also anticipated by the ATM Purchase and ATM Return methods disclosed in the Manual:

- **modifying a purchasing value of the card in response to card use**

The Court has defined "purchasing value of a card in response to card use" as "a value stored on a card itself or a value in an account associated with a card (but not limited to situations where the card holder has a business arrangement with the host data processor.") The Manual discloses a method in which the counter-top terminal is used to modify the value of the account associated with an ATM card by decreasing such value (2:15–2:19) or increasing such value (2:28–2:31) after "a customer slides an ATM card." (2:14, 2:29).

Therefore, claim 11 is anticipated by the ATM Purchase and ATM Return methods for processing debit purchase transactions disclosed by the Manual.

### Claim 12:

Dependent claim 12 includes all of the steps of independent claim 10, but adds one further step which is also anticipated by the ATM Purchase and ATM Return methods disclosed in the Manual:

- **displaying the response from the host data processor for the debit purchase transaction on the counter-top terminal display**

The Manual discloses that an "Approved" (2:18–19, 2:31) or "Declined" message (2:19, 2:31) is displayed.

Therefore, claim 12 is anticipated by the ATM Purchase and ATM Return methods for processing debit purchase transactions disclosed by the Manual.

### Claim 13:

Dependent claim 13 includes all of the steps of independent claim 10, but adds two further steps which are also anticipated by the ATM Purchase method disclosed in the Manual:

- **entering sales data by the clerk; and**

The Manual discloses that "[t]he purchase amount and cashback amount, if any, are entered by the checker on the checker device located in the lane." (2:14; see also 2:16–17.)

- **entering confirmation of the sales data by the customer**

The Manual discloses that "[t]he total is displayed to the customer for approval. The customer PRESSES the key labeled [Yes] or the key labeled [No]." (2:17).

Therefore, claim 13 is anticipated by the ATM Purchase method for processing debit purchase transactions disclosed by the Manual.

### Claim 14:

Dependent claim 14 includes all of the steps of independent claim 10, but adds one further step which is also anticipated by the ATM Purchase and ATM Return methods disclosed in the Manual:

- **printing a debit transaction receipt in response to a print command from the computer**

The Manual discloses that "[i]f the transaction is approved, a receipt is printed." (2:14, see also 2:18, 2:31.)

Therefore, claim 14 is anticipated by the ATM Purchase and ATM Return methods for processing debit purchase transactions disclosed by the Manual.

### Claim 16:

Dependent claim 16 includes all of the steps of independent claim 10, except that the "transaction request transmitting step" in claim 1 comprises three new steps, which are also anticipated by the ATM Return method disclosed in the Manual:

- **entering a credit amount into the computer using the keypad; transmitting the credit amount received to the host data processor; and increasing the value of the debit card by the credit amount**

The Manual discloses a method for processing ATM Returns in which a "return amount" is received from a customer (2:30), that amount is entered by a checker through a keypad (2:30), that return amount "information is sent to the controller" (2:31) which then approves or declines the credit to the ATM account (2:31).

Therefore, claim 16 is anticipated by the ATM Return method for processing debit purchase transactions disclosed by the Manual.

### Claim 17:

Dependent claim 17 includes all of the steps of independent claim 10, except that the "card reading step" in claim 10 comprises a new step, which is also anticipated by the ATM Purchase and ATM Return methods disclosed in the Manual:

- **swiping the card through the card reader**

The Manual discloses that a customer's ATM card is read by the OMNI 490 terminal "when a customer slides [it] ... through a card reader located at the right side of the terminal." (2:14; *see also* 2:15, 2:29.)

Therefore, claim 17 is anticipated by the ATM Purchase and ATM Return methods for processing debit purchase transactions disclosed by the Manual.

### Claim 18:

Dependent claim 18 includes all of the steps of independent claim 10, but adds an additional step and alters the "transaction data entering step" in claim 10 to "include" a new step, changes which are anticipated by both the ATM Purchase and ATM Return methods disclosed in the Manual:

- **providing a remote keyboard communicating with the terminal unit, and wherein the transaction data entering step includes the step of**

**entering data through the keyboard**

The Manual discloses a remote "checker display" with a keyboard through which the checker enters transaction action data. (2:16, 2:30.)

Therefore, claim 18 is anticipated by the ATM Purchase and ATM Return methods for processing debit purchase transactions disclosed by the Manual.

### Claim 19:

Dependent claim 19 includes all of the steps of dependent claim 10, but requires the host data processor to be a particular type of processor, one of which is anticipated by the ATM Purchase and ATM Return methods disclosed in the Manual:

- **Wherein the host data processor includes one of a credit authorization provider, a phone card provider, and a telephone switch.**

As explained above in regard to identical language in claim 9, the language in claim 19 refers to three independent specific types of host data processors, any one of which may be the "host data processor" as used in claim 1.

The Court has previously construed "credit authorization provider" as "a service provider that maintains the value associated with a debit styled card." (D.I. 61 at 26.) The Manual discloses a method that "electronically processes the payment of goods at the point-of-sale" (Manual at 2:14) which includes a request for the host data processor to decrease (2:15–2:19) or increase (2:28–2:31) the value of the account associated with an ATM card. (2:14).

Therefore, claim 19 is anticipated by both the ATM Purchase and ATM Return methods disclosed in the Manual, which utilize a host data processor of a credit authorization provider for processing debit purchase transactions.

## E. Obviousness

■ SVS asserts that claims 4, 15, 23, and 34 are invalid as obvious under 35 U.S.C. § 103 because the Manual in combination with U.S. Patent No. 5,732,136 (the "'136 patent") teaches every limitation of those claims. I do not address SVS's contentions with regard to claims 23 and 34, as I have already held those claims to be invalid for failing to satisfy the written description requirement of 35 U.S.C. § 112 ¶ 1.

Turning to claims 4 and 15,[46] SVS admits that those claims require the steps of "receiving encrypted approval data from the host data processor" and "decrypting the encrypted approval data." (D.I. 103 at 20, 22; '859 patent at 8:23–25, 9:32–35). SVS further admits that those steps are not directly disclosed in either the Manual or the '136 patent. (D.I. 103 at 21–22.) SVS contends, however, that "it would have been obvious to one of ordinary skill in the art in 1996 to include those steps," because, as also stated by SVS's expert, "it would have been obvious to one of ordinary skill in the art to increase security by utilizing encryption and decryption for the validation or approval message sent from a

host data processor." (D.I. 103 at 21; *see* D.I. 104, Ex. A, Breitzke Report at 138.)

Ms. Breitzke indicates that there was a motivation to combine the teachings of the Manual with the '136 patent "to provide electronic processing of all types of transactions at the point-of-sale" by "provid[ing] a method for the secure activation and use of phone cards" in order to "bring added revenues and ... attract additional consumers who purchase other items at the same time." (D.I. 104, Ex. A, Breitzke Report at 197.) Viewed in the light most favorable to CAT, however, the report and opinions of Ms. Breitzke do not persuade me that there is no issue of material fact as to whether one of ordinary skill would feel motivated to "increase security" by encrypting approval data sent from a host processor to a computer, a step not disclosed in the '136 patent but required by the '859 patent.

Therefore, I will deny SVS's motion for summary judgment with respect to obviousness for claims 4 and 15.[47]

## V. Conclusion

For the reasons stated, I will deny CAT's Motion for Summary Judgment of

---

**46.** Claims 4 and 15 read in full as follows:

4. The method according to claim 1, wherein the transaction request transmitting step comprises the step of:
transmitting an activation request for a phone card;
processing a data record for the phone card;
creating a message authorization code;
encrypting phone card data for transmitting to the counter-top terminal;
transmitting the encrypted phone card data to the host data processor;
receiving encrypted approval data from the host data processor;
decrypting the encrypted approval data on the computer for the response displaying step.

15. The method according to claim 10, wherein the transaction request transmitting step comprises the step of:

requesting a phone card;
processing a data record for the phone card;
creating a message authorization code;
encrypting phone card data for transmitting from the counter-top terminal;
transmitting the encrypted phone card data to the host data processor;
receiving encrypted approval data from the host data processor;
decrypting the encrypted approval data on the computer for the response displaying step.

**47.** I do not address all the *Graham* factors, for regardless of an analysis of those factors, SVS's motion for summary judgment fails on the grounds stated.

Validity (D.I. 109) and CAT's Motion to Exclude the Expert Testimony of Lori Breitzke (D.I. 107), grant in part and deny in part SVS's Motion for Summary Judgment of Invalidity Due to Anticipation and Obviousness (D.I. 102), and grant SVS's Motion for Partial Summary Judgment of Invalidity of Claims 20, 22–31, and 33–38 Due to Lack of Written Description (D.I. 167). An appropriate order will follow.

### ORDER

Plaintiff Stored Value Solutions, Inc. ("SVS"), doing business now as Ceridian Stored Value Solutions, Inc., seeks a declaratory judgment of invalidity of U.S. Patent No. 6,032,859 (the "'859 Patent"), owned by Defendant Card Activation Technologies, Inc. ("CAT"), SVS has moved for summary judgment of invalidity of claims 1-3, 5-14, 16-20, 22, 24-31, 33, and 35-38 under 35 U.S.C. § 102 (D.I. 102), of claims 4, 15, 23, and 34 under 35 U.S.C. § 103 (D.I. 102), and of claims 20,22-31, and 33-38 under 35 U.S.C. § 112, ¶ 1 (D.I. 167). CAT has moved for summary judgment of validity of all the claims of the '859 patent (D.I. 109) and to exclude the expert testimony of Lori Breitzke, SVS's expert (D.I. 107). Relevant to the disposition of those motions is the construction of the term "purchase transaction" as used in the patent. (See D.I. 134.)

For the reasons set forth in the opinion issued in this case, IT IS HEREBY ORDERED THAT:

1. The term "purchase transaction" as used in the '859 patent is construed to mean "a transaction with the intended effect of decreasing the purchasing value of, increasing the purchasing value of, or activating a debit styled card."

2. CAT's Motion to Exclude the Expert Testimony of Lori Breitzke (D.I. 107) is DENIED.

3. CAT'S Motion for Summary Judgment of Validity (D.I. 109) is DENIED.

4. SVS's Motion for Partial Summary Judgment of Invalidity of Claims 20, 22-31, and 33-38 Due to Lack of Written Description (D.I. 167) is GRANTED.

5. SVS's Motion for Summary Judgment of Invalidity Due to Anticipation and obviousness (D.I. 102) is GRANTED IN PART regarding anticipation under 35 U.S.C. § 102 for claims 1-3, 5-7,9-14, and 16-19, DENIED IN PART regarding anticipation under 35 U.S.C § 102 for claim 8, DENIED IN PART regarding obviousness under 35 U.S.C. § 103 for claims 4 and 15, and DENIED AS MOOT regarding claims 20, 22-31, and 33-38.